James D. HODGSON, Secretary of Labor,
United States Department of Labor,
Plaintiff-Appellant,

v.

CROTTY BROTHERS DALLAS, INC.,
et al., Defendants-Appellees.

No. 28616.

United States Court of Appeals,
Fifth Circuit.

April 30, 1971.

Rehearing and Rehearing En Banc
Denied Oct. 19, 1971.

L. H. Silberman, Sol., U. S. Dept. of Labor, Washington, D. C., M. J. Parmenter, Regional Atty., U. S. Dept. of Labor, Dallas, Tex., Bessie Margolin, Associate Sol., Truett E. Bean, Carin Ann Clauss, Attys., U. S. Dept. of Labor,

Washington, D. C., Seagal V. Wheatley, U. S. Atty., San Antonio, Tex., Ann Belanger, Atty., Dept. of Justice, Washington, D. C., Leon M. Kestenbaum, Atty., U. S. Dept. of Labor, Washington, D. C., for plaintiff-appellant.

Warren Whitham, Harry I. Freedman, Dallas, Tex., for defendants-appellees.

Alexander E. Wilson, Jr., Alexander E. Wilson III, Wilson, Wilcox & Wilson, Atlanta, Ga., amicus curiae for National Restaurant Ass'n.

Before COLEMAN, INGRAHAM and WILKEY*, Circuit Judges.

WILKEY, Circuit Judge:

This appeal is taken by the Secretary of Labor from a judgment of the District Court that the Crotty Bros. Dallas (Crotty) food service operation at St. Stephen's School is exempt from the overtime and minimum wage provisions of the Fair Labor Standards Act[1] because it is a "retail establishment" within the meaning of § 13(a) (2) (1961) and § 13(a) (2) (1966) of the Act. Finding that the result reached by the District Court was correct, we affirm.

## I. *The Relationship Between the School and Crotty*

Since 1955 appellee Crotty has, pursuant to written contract, operated the dining facilities of St. Stephen's Episcopal School near Austin, Texas. These facilities are located in a separate building on the school premises and comprise a dining room, a kitchen for the preparation of food, and an office which is occupied by the Crotty manager.

The school itself is a combined boarding and day preparatory school owned and operated by the Diocese of Texas of the Episcopal Church, and has an enrollment of 223 male and female students, 170 of whom board on the premises. Tuition for the boarding students includes room and board, and tuition for

the day students includes one meal a day, six days a week. These tuition charges, however, are insufficient to cover the entire cost of operating the school and the deficit is made up either by gifts from interested third parties or by the school's trustees.

With few exceptions, the students while on campus are required to report to the dining hall at mealtimes.[2] They are assigned specific tables and attendance is checked by members of the faculty. Save at breakfast, which is served cafeteria style, one student from each table is appointed to bring food from the kitchen and to serve the others. The meals are prepared and served to these student "waiters" by Crotty employees, hired and subject to discharge by Crotty Dallas.

All food and supplies necessary to the operation of the food service are purchased by Crotty and are delivered to its possession and control at the kitchen, and all menus of meals to be served are prepared by the Crotty manager. Crotty's eleven employees are also responsible for maintenance of cleanliness in the feeding facilities, washing of the dishes, and the setting of the tables for lunch and dinner. According to the underlying agreement, Crotty must hold St. Stephen's harmless for various tort claims arising out of the operation of the dining facilities, and must cover its employees with workmen's compensation and liability insurance, as well as obtain all necessary state and federal licenses for its operations.

Crotty pays no rent for the dining hall or its facilities, and St. Stephen's furnishes all equipment and utilities necessary for efficient operation of the food service. The school also bears the expense of replacing lost silverware, broken china, and glassware. St. Stephen's retains the right to approve the operating policy of Crotty, its menus, and its

---

* Of the District of Columbia Circuit, sitting by designation.

1. Act of 25 July 1938, c. 676, 52 Stat. 1060, as amended; 29 U.S.C. 201–219.

2. Boarding students are permitted to cut one breakfast during the week, and Saturday dinner and Sunday breakfast and dinner are optional.

hours of service, and also has the right to have discontinued the assignment to St. Stephen's of any Crotty employee who is or becomes "obnoxious or unsatisfactory" to the school or its agents.

Crotty does not collect money or vouchers directly from the students, faculty or authorized guests it serves. Instead, it submits to St. Stephen's a monthly statement showing its operating costs, including payroll, food, and supplies purchased, and receives from the school the amount of its costs plus, at the time of trial, $750.00 per month.

## II. Proceedings in the District Court

Claiming that this operation was covered by the Fair Labor Standards Act, the Secretary of Labor brought suit in the District Court to enjoin Crotty from violating its minimum wage, overtime, and record-keeping requirements, and to restrain the continued withholding of unpaid wages allegedly due the Crotty employees for periods worked since 31 January 1966.[3]

Crotty stipulated that its activities at the school, a small part of its nationwide operations, were activities in an enterprise within the meaning of § 3(s) of the Act. It also admitted noncompliance with the Act's minimum wage and overtime provisions, but claimed that the employees at the St. Stephen's operation were exempt from these provisions by virtue of § 13(a) (2), which exempts employees of relatively small retail service establishments, even though within an enterprise, from the minimum wage and overtime provisions of the Act. In addition, it claimed that prior to 1 February 1967 (the effective date of the latest amendment to the Act) its employees

were exempt from both its minimum wage and overtime provisions under § 13(a) (2) (ii), exempting employees of enterprises constituting restaurants, and § 13(a) (20), exempting employees of retail service establishments engaged primarily in food service operations such as catering, box lunch, or curb or counter service to either public or restricted clienteles. And it claimed that subsequent to 1 February 1967 its operation at the school was at least exempt from the Act's minimum wage requirement by virtue of §§ 13(b) (8) and 13(b) (18), essentially the equivalents of former §§ 13(a) (2) (ii) and 13(a) (20), respectively, though having been narrowed to an exemption from only the overtime provisions of the Act.

Rejecting the Secretary's various contentions to the contrary, the District Court found the Crotty employees at St. Stephen's exempt from coverage under § 13(a) (2) of the Act, and, since this was considered dispositive of the entire controversy, made no findings as to the applicability of the remaining provisions. This appeal followed.

## III. Derivation From the Act of Principles Applicable to the Case at Bar

### A. "Individual" coverage of food service operations.

Prior to being amended for the first time in 1949, the Fair Labor Standards Act covered through § 3(j), *inter alia,* activities of individual employees "necessary" to the production of goods for commerce.[4] This led the United States District Court for the Northern District of Ohio in McComb v. Factory Stores of Cleveland[5] to find that the employees of

---

3. The Secretary appears to have conceded that collection of unpaid wages accrued prior to this time is barred by a two-year statute of limitations.

4. Prior to the 1949 amendments to the Act, § 3(j) in providing individual coverage read:

    "Produced" means produced, manufactured, mined, handled, or any other manner worked on in any State; and for the purposes of this Act an em-

ployee shall be deemed to have been engaged in the production of goods if such employee was employed in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, or in any process or occupation *necessary to the production thereof,* in any State. (Emphasis supplied).

5. 81 F.Supp. 403 (D.Ohio 1948), remanded 179 F.2d 238 (6th Cir. 1949).

Factory Stores working at its food service operations in the factories and offices of Republic Steel were covered by the Act just as were the Republic employees themselves.

The *Factory Stores* opinion notes several factors that tied the food service operation in with the overall operation of Republic, including the close contractual connection between Republic and Factory Stores, which provided that Republic would furnish the land on which the feeding units were placed in operation and would bear the cost of the original installation as well as the supplying of the utilities; the concern of the Republic management over the services and food available in the facilities; and conditions in the factories that made it impossible for Republic employees to eat elsewhere—along with the benefits to Republic of maintaining such conditions, *e. g.*, dovetailing of lunch periods with work schedules, shortening of lunch periods, and immediate availability of employees during their shifts regardless of outside weather conditions.

This close connection between the food service operation and Republic's own activities, and Republic's reliance thereupon led the court to the conclusion that "the fueling of the human beings who operate the machines" was as essential to the production of Republic's goods "as the fueling of the boilers which run those machines"; hence, the employees

of the food service were covered by the Act.

The court only nodded at the retail service exemption provided in § 13(a) (2),[6] citing as dispositive the Supreme Court case of Roland Electrical Co. v. Walling which bluntly stated, "to the extent that sales or services are necessary for the production of goods for interstate commerce they generally are by that hypothesis not sales or services to an ultimate consumer for his personal use and, accordingly, are neither 'retail' sales nor services of a comparable character, within the meaning of § 13(a) (2)."[7]

One year later, in 1949, Congress reacted to *Factory Stores* and *Roland* by striking from § 3(j) the word "necessary" and substituting language requiring the employee to be engaged in a "closely related" occupation "directly essential" to the production of goods before coverage would attach, and amended § 13(a) (2) to make it more specific and to contain its own definition of what constitutes a retail or service establishment.[8]

With respect to *Factory Stores*, Congress made its intent clear in the legislative history, which said:

> Coverage of the act has also been extended [by the courts] to employees of an *independently owned and operated restaurant located in a factory.*

---

6. At that time, § 13(a) (2) simply exempted:
   (2) any employee engaged in any retail or service establishment the greater part of whose selling or servicing is in intrastate commerce; * * *.

7. 326 U.S. 657, 667, 66 S.Ct. 413, 417, 90 L.Ed. 383 (1946).

8. After the 1949 amendments, § 3(j) read:
   (j) "Produced" means produced, manufactured, mined, handled, or in any other manner worked on in any State; and for the purposes of this Act an employee shall be deemed to have been engaged in the production of goods if such employee was employed in producing, manufacturing, mining, handling, transporting, or in any other manner

working on such goods, or in any closely related process or occupation *directly essential to the production thereof*, in any State. (Emphasis supplied.)
And § 13(a) (2) read:
   (2) any employee employed by any retail or service establishment, more than 50 per centum of which establishment's annual dollar volume of sales of goods or services is made within the State in which the establishment is located. A *"retail or service establishment" shall mean an establishment 75 per centum of whose annual dollar volume of sales of goods or services (or of both) is not for resale and is recognized as retail sales or services in the particular industry;* * * * (Emphasis supplied.)

(McComb v. Factory Stores, 81 F. Supp. 403 (N.D.Ohio 1948).)

Under the bill as agreed to in conference an employee *will not be covered unless* he is shown to have a *closer* and a *more direct relationship* to the producing, manufacturing, etc., activity than was true in the above-cited cases.

\*    \*    \*    \*    \*    \*

The following are some examples of cases in which the Administrator and the courts will no longer be able to hold the act applicable because the activities involved in such cases are not closely related or directly essential to production:

\*    \*    \*    \*    \*    \*

[E]mployees engaged in providing residential, eating, or other living facilities for factory workers, are quite clearly not performing any activities that are closely related or directly essential to the production of goods.[9] And as to the test provided in § 13(a)(2) for the retail character of an establishment, after making it clear that a sale can be retail even if to a business customer, the House Managers said:

> The location of the establishment, whether in an industrial plant, an office building, a railroad depot, or a Government park, etc., will make no difference in the application of the exemption. So long as the establishment meets the tests described above,

it will be excluded from the minimum wage and overtime provisions of the act.[10]

Plainly, Congress did not want employees of "independently owned and operated" food service establishments like those involved in *Factory Stores*, regardless of whether they be located in a factory, office building, railroad depot, etc., to be individually covered under § 3(j) of the Act. Something extra, a factor which more directly involved these employees in the activities of an operation already covered by the Act, was required.

This "something extra" was found in the isolation of a mining operation by the Ninth Circuit in Mitchell v. Anderson et al.[11] "Substantial need" for a mess hall and bunkhouse at an Anaconda Company copper mine twenty to forty miles from the nearest towns justified, in the court's view, the conclusion that the activities of the employees of the independent contractor operating the facility were "directly essential" to the production of ore from the mine within the meaning of § 3(j), as amended.

### B. *"Enterprise" coverage of food service operations.*

Of course, in the case at bar, we are not dealing with "individual" coverage under § 3(j) but with enterprise coverage under §§ 3(r) and 3(s), added to the Act by Congress in 1961.[12] The fo-

---

9. Statement of the Managers on the Part of the House, Conference Report No. 1453, 17 Oct. 1949, 81st Congress, First Session, 1949, 2 U.S.Code Congressional Service, at pp. 2252–53.

10. *Id.* at 2264–65.

11. 235 F.2d 638 (9th Cir. 1955).

12. When added in 1961, § 3(r) read:
   (r) "Enterprise" means the related activities performed (either through unified operation or common control) by any person or persons for a common business purpose, and includes all such activities whether performed in one or more establishments or by one or more corporate or other organizational units including departments of an establishment operated through leasing arrange-

ments, but shall not include the related activities performed for such enterprise by an independent contractor: *Provided*, That, within the meaning of this subsection, a retail or service establishment which is under independent ownership shall not be deemed to be so operated or controlled as to be other than a separate and distinct enterprise by reason of any arrangement, which includes, but is not necessarily limited to, an agreement, (1) that it will sell, or sell only, certain goods specified by a particular manufacturer, distributor, or advertiser, or (2) that it will join with other such establishments in the same industry for the purpose of collective purchasing, or (3) that it will have the exclusive right to sell the goods or use

cus of these provisions is fixed upon the activity of the organization constituting the enterprise rather than upon the individual in determining coverage. For example, § 3(r) describes an "enterprise" in terms of "related activities performed * * * in one or more establishments or by one or more corporate or other organizational units * * *," and § 3(s) describes an enterprise covered by the Act, i. e., an enterprise "engaged in commerce or in the production of goods for commerce," in terms of business purpose and gross volume of sales.

No matter if the employees of one unit or establishment in the enterprise would have been excluded from coverage under the provisions of § 3(j), relating to their activities as individuals, they are covered by virtue of their employment in the organization as a whole. In other words, in this type of coverage it is determinative of nothing to show that the activities of the individual employees of any establishment or unit constituting part of an "enterprise" are "closely related" or "directly essential" to the activities in commerce of the enterprise or of any other entity covered by the Act. They are automatically covered because the enterprise is covered.[13]

Covered, that is, unless they, within their own unit of the enterprise, are excluded by one of the exemption provisions of the Act. For unlike the principal inquiry in the individual coverage situation, i. e., whether coverage attaches at all under § 3(j), the key question here becomes whether, once coverage has attached to the entire enterprise, the employees as members of any of its component units or establishments are *exempted* from coverage under other pertinent provisions of the Act.

Congress recognized the increased emphasis enterprise coverage placed upon the exemption provisions of the Act, and amended § 13(a) (2) to include, *inter alia*, a restaurant exemption and an exemption for certain retail or service establishments *in enterprises*. It also added § 13(a) (20), exempting employees of retail or service establishments employed primarily in food service operations such as catering, banquet, box lunch, etc.[14]

the brand name of a manufacturer, distributor, or advertiser within a specified area, or by reason of the fact that it occupies premises leased to it by a person who also leases premises to other retail or service establishments.
And § 3(s) read, in pertinent part:
(s) "Enterprise engaged in commerce or in the production of goods for commerce" means any of the following in the activities of which employees are so engaged, including employees handling, selling, or otherwise working on goods that have been moved in or produced for commerce by any person:
(1) any such enterprise which has one or more retail or service establishments if the annual gross volume of sales of such enterprise is not less than $1,000,000, exclusive of excise taxes at the retail level which are separately stated and if such enterprise purchases or receives goods for resale that move or have moved across State lines (not in deliveries from the reselling establishment) which amount in total annual volume to $250,000 or more; * * *.
In 1966, Congress amended § 3(s) to include as enterprises "engaged in commerce or in the production of goods for

commerce," schools, which had not previously fallen under the Act. Thus, effective 1 February 1967 (the effective date of the 1966 amendments), the employees of St. Stephen's school became enterprise-covered employees under the Act.

13. Thus, with respect to coverage of the Crotty employees under the Act, it makes no difference that prior to 1 February 1967 employees of St. Stephen's school were not so covered. Coverage of the Crotty employees hinges only on the fact that they constitute part of the Crotty "enterprise." Unless exempted, the Crotty employees at all times relevant to this case were covered by the Act.

14. After the 1961 amendments, § 13(a) (2) read, in pertinent part:
The provisions of sections 6 and 7 shall not apply with respect to—
* * * * *
(2) any employee employed by any retail or service establishment, more than 50 per centum of which establishment's annual dollar volume of sales of goods or services is made within the State in which the establishment is located, if such establishment—
* * * * *

Commenting upon these changes, the Senate Managers stated:

> An exemption is also provided, without regard to annual sales volume of the enterprise, for employees of a retail or service establishment employed primarily in connection with the preparation or offering of food for human

> (ii) is in such an enterprise and is a hotel, motel, *restaurant*, motion picture theater; or is an amusement or recreational establishment that operates on a seasonal basis, or
> 
> \*    \*    \*    \*    \*
> 
> (iv) is in such an *enterprise* and has an *annual dollar volume of sales* (exclusive of excise taxes at the retail level which are separately stated) *which is less than $250,000.*
> 
> A "retail or service establishment" shall mean an establishment 75 per centum of whose annual dollar volume of sales of goods or services (or of both) is *not for resale and is recognized as retail sales or services in the particular industry*; or   \*   \*   \*. (Emphasis supplied.)

And the § 13(a) (20) exemption read:

> The provisions of sections 6 and 7 shall not apply with respect to—
> 
> \*    \*    \*    \*    \*
> 
> (20) any employee of a retail or service establishment who is employed primarily in connection with the preparation or offering of food or beverages for human consumption, either on the premises, or by such services as catering, banquet, box lunch, or curb or counter service, to the public, to employees, or to members or guests of members of clubs; or \* \* \*.

In 1966, Congress amended § 13(a) (2) to remove from the aegis of enterprise exemption, § 13(a) (2) (ii) relating to restaurants and the like, and added § 13(b) (8), exempting from only § 7, *i. e.*, the overtime provisions of the Act, all restaurants, etc., regardless of their inclusion in an enterprise. This section now reads:

> (b) The provisions of *section 7* shall not apply with respect to—
> 
> \*    \*    \*    \*    \*
> 
> (8) any employee employed by an establishment which is a hotel, motel, or *restaurant*; or any employee who (A) is employed by an establishment which is an institution (other than a hospital) primarily engaged in the care of the sick, the aged, or the mentally ill or defective who reside on the premises, and (B) receives compensation for employment in excess of forty-eight hours in any work-week at a rate not less than one and one-half times the regular rate at which he is employed; \* \* \*. (Emphasis supplied.)

Likewise, Congress replaced § 13(a) (20) with § 13(b) (18), reading:

> (b) The provisions of *section 7* shall not apply with respect to—
> 
> \*    \*    \*    \*    \*
> 
> (18) any employee of a retail or service establishment who is employed primarily in connection with the preparation or offering of food or beverages for human consumption, either on the premises, or by such services as catering, banquet, box lunch, or curb or counter service, to the public, to employees, or to members or guests of members of clubs; or \* \* \*. (Emphasis supplied.)

As a result, § 13(a) (2) became:

> Sec. 13. (a) The provisions of sections *6 and 7* shall not apply with respect to—
> 
> \*    \*    \*    \*    \*
> 
> (2) any employee employed by any retail or service establishment (except an establishment or employee engaged in laundering, cleaning, or repairing clothing or fabrics or an establishment engaged in the operation of a hospital, institution, or school described in section 3(s) (4)), if more than 50 per centum of such establishment's annual dollar volume of sales of goods or services is made within the State in which the establishment is located, and such establishment is not in an enterprise described in section 3(s) or such establishment has an annual dollar volume of sales which is less than $250,000 (exclusive of excise taxes at the retail level which are separately stated). A "retail or service establishment" shall mean an establishment 75 per centum of whose annual dollar volume of sales of goods or services (or of both) is not for resale and is recognized as retail sales or services in the particular industry; or \* \* \*. (Emphasis supplied.)

None of these amendments, which became effective 1 February 1967, affected the substance of the 1961 version of § 13(a) (2) relating to the exemption of retail or service establishments *in enterprises.* Under both the 1961 and 1966 versions of § 13(a) (2), it is necessary to show that a retail or service establishment *in an enterprise* has an annual dollar volume of sales which is less than $250,000, more than 50% of which dollar volume of sales is made in the state.

consumption on the premises or by such services as catering, banquet, box lunch, or curb or counter service to the public, to employees, or to members or guests of members of clubs. *Clauses (2) and (20) of section 13(a) also are intended to continue the exemption for independently owned and operated restaurants in industrial plants, office buildings, Government installations, hospitals, or colleges, such as were involved in* McComb v. Factory Stores (81 F.Supp. 403 (1948)).[15]

Congress thus ordained that insofar as employees of establishments covered by the Act as parts of enterprises are concerned the exclusionary function once served by coverage provision 3(j) in the individual context is to be performed primarily by exemption provision 13 (a) (2) in the context of enterprise coverage.[16] And Congress intended this provision to exclude from the Act food services in industrial plants, colleges, etc., "such as were involved in McComb v. Factory Stores."

Exemption in the case at bar is sought initially under § 13(a) (2), which requires that the unit of the enterprise seeking exemption have more than 50% of its dollar volume of sales made within the state, have an annual dollar volume of sales of less than $250,000.00, and be a "retail or service establishment" within the meaning of the Act.[17] There is no dispute that the Crotty operation satisfies the first two of these criteria; the argument centers on whether Crotty's operation at St. Stephen's satisfies the Act's definition of "retail or service establishment."

The definition of "retail or service establishment" unchanged from its 1949 version though now relating to establishments *in enterprises* as well as certain businesses otherwise covered by the Act, calls for "an establishment 75 per centum of whose annual dollar volume of sales of goods or services (or of both) is not for resale and is recognized as retail sales or services in the particular industry; * * *."[18] Hence, an operation forming part of an enterprise described in § 3(a) and meeting all the other tests of § 13(a) (2) must still meet three more tests before qualifying for exemption: that it be an establishment; that it have 75% of its sales not for resale; and that it have 75% of its sales recognized as retail in the relevant industry.

IV. *Qualification of the Crotty Food Service Operation as an Establishment*

Prior to the introduction of enterprise coverage in 1961, food service operations found to be covered under § 3(j) attempted to assert the exemption provided by § 13(a) (2), but the question was always overshadowed by the threshold determination under the former of whether the employees' activities were "closely related" or "directly essential" to activities already covered by the Act.

---

15. Senate Report No. 145, 10 April 1961, 87th Congress, First Session, 1961, 2 U.S. Code Congressional and Administrative News, at p. 1647. *See also* Statement of the Managers on the Part of the House, Conference Report No. 327, 2 May 1961, 87th Congress, First Session, 1961, 2 U.S. Code Congressional and Administrative News, at p. 1708, which is to the same effect.

16. In this regard, it is to be noted that § 13(a) (20) was not specific to establishments covered as parts of enterprises while § 13(a) (2) (iv) was. Thus, § 13(a) (20) was available for use by retail or service establishments engaged in caterings, etc., services regardless of

how covered by the Act. Conceivably, then, a retail establishment meeting the criteria with respect to sales volume, etc., of § 13(a) (2) (iv) as well as the catering criteria of § 13(a) (20), was eligible for exemption under either. Of course, since 1 February 1967, when § 13(a) (20) was replaced by § 13(b) (18), narrowing its exemption to solely the overtime provisions of the Act, it has become doubly advantageous for a catering-type retail establishment *in an enterprise* to seek exemption under § 13(a) (2), which relieves it, as always, from the minimum wage *and* overtime provisions of the Act.

17. *See* note 14, *supra.*

18. *See* notes 8 and 14, *supra.*

For if, as was pointed out in *Anderson, supra,* a facility is found to be so integrated with operations of another entity already covered by the Act that its employees may be characterized as performing work directly essential to the latter's operations, it would be inconsistent to conclude that the facility is a separate retail establishment.

But in enterprise coverage, there is no such decisive initial determination; we proceed directly to § 13(a) (2) and the question of whether the operation sought to be exempted has the status of an "establishment" within the meaning of the Act. Qualification as an establishment thus assumes critical significance in the context of enterprise coverage not unlike that of qualification for coverage under § 3(j) when individual applicability of the Act is asserted; however, it does not necessarily turn on the same factors or have the same consequences as the latter. For because an operation in a § 3(s) enterprise is covered by the Act from the start regardless of connection to any previously covered entity, exclusion from the Act instead ought to hinge on the basic criteria developed with respect to operations brought under the Act by other than the "tacking" provisions of § 3(j).

In such cases, we have looked primarily to whether the business sought to be categorized as an "establishment" is *functionally separate* from other business, although we have recognized that a certain degree of functional relationship can exist between the business in question and other entities without destroying its functionally separate character.[19] The difficulty in this approach lies in determining the point at which the functional relationship so overpowers the business' separate character as to destroy its status as an "establishment" under the Act. However, Congress has made our task easier with respect to food service operations like those involved here by declaring in the legislative history of the 1961 amendment that "independently owned and operated" food services "such as were involved in McComb v. Factory Stores" are to be exempted from the Act under § 13(a) (2).[20] With respect to a food service operation located in a factory, railroad station, college, etc., it is therefore essential to find at least one substantial factor relating the function of the food service to the function of the host entity more closely than in *Factory Stores* before denying the exemption on the ground that food service is not an "establishment".

■ In the case at bar the Secretary cites several factors demonstrating the ineligibility of the Crotty food service at St. Stephen's for designation as an "establishment," including the power of the school to "guide" the food service through exercise of its contractual right to approve Crotty's operating policy, hours of service, menus, and to have transferred any Crotty employee it deems unsatisfactory; the ownership by the school of Crotty's place of business; the payment to Crotty of its costs plus a monthly guaranteed profit; and the compulsory attendance of the students at most meals. We find that none of these provides the necessary additional tie, functionally relating Crotty and the school more closely than were Factory Stores and Republic Steel.

The contract involved in *Factory Stores* required the food service to locate where Republic specified; carry equipment such as overalls, gloves, and caps, specified by Republic; furnish at all times good, wholesome food at current prices; schedule its operations to correspond with Republic's; open new units when required by Republic; and to seek consent and approval from Republic before closing any units that became unprofitable.[21] We find the "pow-

---

19. Mitchell v. Gammill, 245 F.2d 207, 210 (5th Cir. 1957). *See also* Mitchell v. T. F. Taylor Fertilizer Works, 233 F.2d 284, 286 (5th Cir. 1956).

20. *See* text at 12, *supra.*

21. 81 F.Supp., at 404.

er" given to the host company by this contract to be much more pervasive than that involved in the contract between Crotty and St. Stephen's. Factory Stores' operating hours, locations, and policy with respect to the merchandise carried, location and timing of new units, and closing of unprofitable units were all controlled by Republic. Moreover, by means of the clause requiring the furnishing of "good, wholesome food at current prices" Republic was in excellent position to exercise as much, if not more, control over the Factory Stores menus than could St. Stephen's over Crotty's in the present case. And it is clear from a reading of *Factory Stores* that Republic took advantage of it; there were frequent meetings between Republic and union officials on the quality and quantity of the food served.[22]

As to the school's ownership of the building and equipment used by Crotty, we need only note the extremely favorable leasing arrangement between Republic and Factory Stores—Republic furnished all original installation and supplied all utilities while Factory Stores paid certain rent based on gross receipts at some locations, and at at least one other (in the office building) paid no rent.[23] Because the arrangement here was no different from the ownership arrangement in at least one of the Factory Stores outlets, we conclude that Congress intended ownership of the premises and equipment by the host company to be no bar to exemption under § 13(a) (2); hence, of no consequence in the determination of whether the occupant of the premises qualifies as an "establishment."

Nor is it significant, in determining whether Crotty's operation at St. Stephen's qualifies as an establishment, that Crotty contracted with the school for a monthly guaranteed profit rather than bear the risk of profit or loss. This arrangement does not bring the *functions* of Crotty and St. Stephen's more closely together than they would have been had Crotty chosen to bear this risk. The arrangement vested no more power in the school to determine how the food services should be conducted than it otherwise would have had. For there was no option given the school under the contract to refuse to pay, for example, because it determined that the materials bought were too expensive, or that other materials should have been bought instead, or that Crotty had too many people on the payroll. The contract merely called for payment "for all costs incurred in the operation of the food service," with the only provision being that the school would not be charged for overhead at the home office and income taxes. Therefore, although the method of remuneration here was different from that in *Factory Stores,* where the food contractor did accept the risk of profit or loss, it was not the required "substantial factor" leading to a closer relationship between the functions of the school and Crotty.

The school's rule compelling attendance of the students at most meals likewise fails to provide the additional functional link because conditions in the Republic Steel factories in *Factory Stores* were such that attendance of the employees at the food service outlets verged on compulsion. The company had a rule prohibiting production workers from leaving the premises during their shifts, and gave the men at most one half hour to eat.[24] Obviously those who did not wish to rely on lunch buckets had to patronize the in-plant food service provided by Factory Stores, and, in fact, most employees did just that.

Even if we could perceive that the lack of a company rule compelling the employees to eat at the in-plant food services makes *Factory Stores* distinguishable, we would find the cases distinguishable in an immaterial respect.

22. *Id.,* at 409.

23. *Id.,* at 404.

24. *Id.,* at 405.

For we must regard the facts with a realistic outlook: The rule here was a disciplinary one not promulgated by the school to maximize the business of the food service, but rather to fulfill its obligation to care for the welfare of its students who were juveniles in grades 8–12. Unlike an employer, who is not responsible for supervising his employees on their own time, a boarding school has a contractual and legal duty to see to the welfare of its charges in class and out; hence, the school here devised this rule to aid it in assuring the well-being and whereabouts of those for whom it was responsible.

Certainly, the operations of St. Stephen's and Crotty were functionally related. St. Stephen's held itself out to be a boarding school which, in common parlance, means that it gave the public the impression that besides its primary function of education, it provided residential and feeding facilities for its students. And Crotty was the operator of those feeding facilities. We are taught, however, both by *Factory Stores* and the legislative history to the 1961 amendment that this degree of functional relationship is insufficient to destroy the functionally separate character of Crotty's operation; hence, its status as an "establishment."

First of all, it was noted in *Factory Stores* that during a labor shortage, Republic held out as one of its attractions the food service provided in its factories.[25] Yet in spite of this obvious promotion by the host company of the "independent" food service operations, Congress made it and others so situated exempt from the force of the Act. Second, the legislative history of the 1961 amendment made it clear that *Factory Stores*-type food services in *colleges* were to be exempt under § 13(a) (2).[26] Colleges are frequently expected to provide, besides education, feeding and residential facilities for use by the students and faculty who wish to live on campus. Thus, it could not have occurred to Congress that the functional relationship between an on-campus food service and the educational institution it served would be sufficient to destroy the character of the former as a separate establishment. And we do not perceive that the functional relationship between Crotty and St. Stephen's was any more intensive so that it destroyed the status of the Crotty operation as an establishment.

## V. *Crotty's Sales Not Sales for Resale*

The Secretary contends that Crotty's operation at St. Stephen's is nevertheless not exempt from the Act because its sales are sales for resale. Basing his argument upon the absence of any direct payment either by means of cash or coupons to Crotty from the students, and upon the existing method of payment whereby the school compensates Crotty at cost plus a guaranteed profit out of funds it collects as tuition from the students' parents, the Secretary urges that the meals are actually sold first to the school and then by the school to the students.

The contractual relationship between Crotty and the school can, we think, be best characterized as a third party beneficiary contract, with the school, charged with the welfare of the students by virtue of its separate contract with their parents, contracting for food services to be supplied them. It is unrealistic to attempt to find a contract between Crotty and the parents for a portion of the tuition in exchange for food services, since it is likely that most parents never heard or thought of Crotty when they made their tuition payments. Their understanding would have been that they were contracting with St. Stephen's for all services normally provided in a boarding school. Had a child been injured by the food served in the school dining room, his parents would have looked first to St. Stephen's. There is even recognition of this in the contract between Crotty and the school: Crotty agreed to save the school harmless in

---

25. *Id.*, at 409.

26. *See* text at 12, *supra*.

tort actions by any persons, if such actions arose out of the food service operation.

All this means that even though no completed meals ever passed from Crotty to the school, it would seem more reasonable to characterize the transactions involving Crotty, the school, and the students as sales for resale than as sales directly from Crotty to the students. Hence, if these were the only alternative characterizations available, the Secretary would prevail. He does not, however, because the services provided by Crotty are most appropriately characterized as "catering" services, which, as will be seen from the following discussion, leads inevitably to the conclusion thet the Crotty operation at St. Stephen's is a "retail" operation under the Act.

In the broad category of services classified as "catering," one of the most common forms of contractual arrangements relating a caterer, the party managing the catered event, and the consumer of the catered food is substantially identical to the contractual setup relating Crotty, St. Stephen's, and the students in this case. The caterer contracts with the party managing the catered event to provide food service to third parties, and he is paid by the manager out of funds collected in advance from these third parties. In turn the manager of the catered affair contracts with his "customers" to provide not only food but also a range of other services, for example, hotel or club accommodations, entertainment, or educational seminars. From the "customers'" collective point of view, they have no direct contact with the caterer; they normally pay their fees directly to the managing party for the entire range of services to be provided. And if one of them has a complaint about the food service, he will undoubtedly go to the managing party to air it. As we have seen, these characteristics are all shared by the setup in the case at bar; hence, the services performed by Crotty at the school are most appropriately termed "catering" services.

In § 13(b) (18)—formerly § 13(a) (20)—of the Act, *retail or service* establishments providing *"catering * * * service* to the public, to employees, or to members or guests of members of clubs * * * "* are exempted from the overtime provisions of the Act.[27] What is important for our purposes, however, is not the nature of the exemption provided in this section, but that the function of providing "catering service" to public or restricted clienteles is obviously classified as *"retail"* therein. Such classification has a direct effect on what should or should not be considered "retail" under the "retail" tests of the "retail or service establishment" definition in § 13(a) (2), *i. e.*, the "sale for resale" and the "recognition as retail in the industry" tests. What activities are found not to be "retail or service" in nature under these two tests ought not to be inconsistent with activities expressly classified as "retail or service" in nature in another provision of the Act. To do so would be to attribute an inconsistency of purpose to Congress.[28]

---

27. *See* note 14, *supra.*

28. Were we to hold that catering establishments must meet the generalized tests of § 13(a) (2) for the "retail or service" nature of their activities before qualifying for consideration for exemption under § 13(b) (18), a large percentage of caterers—those who do not collect their fees from the consumers of the meals provided—would never be able to claim the exemption. For their sales would be more readily characterized as sales for resale than direct sales to the consumer. Clearly, Congress never intended this result to obtain; rather, it must have intended catering services to be considered "retail" in spite of the tests of § 13(a) (2). As much was said, though in a different context, by the Supreme Court in Idaho Sheet Metal Works v. Wirtz, 383 U.S. 190, 203–204, n. 16, 86 S.Ct. 737, 15 L.Ed.2d 694 (1966), when it noted that the "retail or service" exemption of § 13(a) (2) must have been intended to extend to some normally nonconsumer goods such as trucks because § 13(a) (19) exempts "any employee of a

Therefore, regardless of the fact that, in the abstract, it might be possible to characterize the dealings of a caterer like Crotty as sales for resale than as direct sales to the consumer, the result inevitably flowing from such characterization, i. e., loss of exemption due to failure to satisfy the general definition of "retail or service establishment" of § 13(a) (2), is averted by Congress' specific classification, evidenced in § 13 (b) (18), of establishments providing catering services as retail establishments.

## VI. *Sales Recognized as Retail in the Industry*

Finally, the Secretary contends that Crotty failed to meet its burden of proving that its sales at St. Stephen's are recognized as retail in the industry.

Crotty introduced the testimony of two expert witnesses: Mr. Galvin of the National Restaurant Association and Mr. Price of the Texas Restaurant Association. Each testified that the foods service operation at St. Stephen's was retail and recognized as retail in the food service industry. If this were all that the court had before it, we would be constrained to hold in favor of the Secretary on this point because all that this testimony established in and of itself was recognition *by* trade associations involved in the food service industry of the retail nature of Crotty's operation. As the Supreme Court inferred in Idaho Sheet Metal Works v. Wirtz,[29] such testimony proves only recognition *by* the industry instead of *in* the industry. Proof of recognition *in* the industry must include recognition of the retail nature of the transactions by disinterested sources, lest member organizations in various industries be permitted to create their own exemptions.[30]

But the District Court *did* have the best disinterested source of all before it: the wording of the Act itself. As we pointed out in the preceding section of this opinion, the wording of § 13(b) (18) includes in the category of retail establishments catering establishments, which we find indistinguishable from Crotty's operation at St. Stephen's. And classification as such by Congress forecloses argument that both general "retail" tests of § 13(a) (2) have not been met.

In sum, we find that the Crotty operation at St. Stephen's school is an establishment within the meaning of the Act, and that it operates a catering-type service clearly recognized in the express terms of § 13(b) (18), hence by Congress, as "retail" in nature. Having been thus defined as a *retail establishment*, the Crotty operation cannot be stripped of this status by reference in the abstract to the "sale for resale" and "industry recognition" tests provided in the statutory definition of a retail or service establishment. Satisfaction of these criteria was pre-ordained by Congress when it termed certain establishments, including catering establishments

*retail or service* establishment * * * primarily engaged in the business of selling * * * trucks," regardless of whether such establishment meets the "retail" tests, i. e., the "sale for resale" and "recognition in the industry as retail" tests of § 13(a) (2).

29. 383 U.S. 190, 199–200, 86 S.Ct. 737, 15 L.Ed.2d 694 (1966). *See also* Wirtz v. International Harvester Company, 331 F.2d 462, 465 (5th Cir. 1964), *cert. denied*, 379 U.S. 845, 85 S.Ct. 36, 13 L.Ed. 2d 50 (1964); Mitchell v. City Ice Company, Inc., 273 F.2d 560 (5th Cir. 1960).

30. In the House Conf.Rep., p. 25, 95 Cong. Rec. 12501, Senator Holland, the sponsor of the 1949 amendment introducing the definition of "retail or service establishment" to § 13(a) (2), in answering a question as to whether the interpretation given by a trade association to "retail sale" would control the determination of what is recognized as retail in the industry, said:

That is one criterion, of course, but I do not believe that the Senator from Illinois, and certainly not the Senator from Florida, would wish to delegate full authority in the matter to a trade association or any other interested group.

serving the public or restricted clienteles, "retail" in nature.

## VII. *Crotty's Remaining Contentions*

■ Since we find the Crotty operation in St. Stephen's to be a retail or service establishment providing catering service to the student body, faculty, and authorized guests of St. Stephen's, all the criteria save the last, relating to the types of clienteles served by such caterers, of former § 13(a) (20) and present § 13(b) (18)—which became effective 1 February 1967—have been met. We think, however, that the category "employees, or * * * members or guests of members of clubs * * *" is sufficiently large to include the class of persons served at St. Stephen's. A boarding school may be looked upon as a type of educational club in such analysis. Therefore, Crotty is entitled to exemption under these provisions should it so desire.[31]

■ With respect to Crotty's assertion of exemption as a "restaurant" under former § 13(a) (2) (ii), and present § 13(b) (8), we express no opinion other than to note that Congress, in the legislative history to the 1961 amendment, indicated that it expected § 13(a) (2)—with no limitation on which subparagraph of that section could be asserted—to keep *Factory Stores*-type food services from under the Act. And although in *Factory Stores* the food service operations were referred to as "catering" operations,[32] Congress referred to them as "restaurants."[33] Thus, a catering operation is not barred from asserting its status under the Act as a restaurant. What types of catering operations may also qualify as restaurants, we do not consider here.

The judgment of the District Court is

Affirmed.

## ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

The Department of Labor has filed a petition for rehearing *en banc* alleging, *inter alia*; that in our original opinion filed in this case on 30 April 1971 we misconstrued Congress' intent in 1961 when it passed § 13(a) (20) of the Fair Labor Standards Act. Because the petition for rehearing indicates, in our view, that the Department of Labor has wholly misapprehended the legislative history of this section, and because our opinion in this case is alleged to affect a great many suits that the Department has pending (some 65 in number), we issue this supplemental opinion.

## I. *The Petition for Rehearing*

■ The major premise of the petition for rehearing, that Congress "considered and rejected a blanket exemption for employees engaged in food preparation," is based upon a comparison between the version of the 1961 bill reported to the House by the House Committee on Education and Labor, which exempted from the Act's minimum wage and overtime provisions

> any employee of an *establishment* primarily engaged in the preparation or offering of food for human consumption by such services as catering, banquet, box lunch, or curb or counter service, to the public, to employees, or to members or guests of members of clubs; * * *

and the Ayres substitute bill that was finally adopted by the House, which exempted

> any employee employed by a *retail establishment* who is employed in connection with a lunch counter, restaurant, or cafeteria in such establishment * * *.

The House's replacement of the word "establishment" with the expression "re-

---

31. However, we doubt that, having won exemption under § 13(a) (2), Crotty would prefer exemption under § 13(b) (18) and its predecessor. Full explication of the reasons for this may be found in note 16, *supra*.

32. 81 F.Supp., at 404.

33. *See* text at 8 and 12, *supra*.

tail establishment" and the use of the expression "retail or service establishment" in the equivalent Senate and conference versions demonstrate, according to counsel for the Department of Labor, that initially *all* caterers were exempted, but that both sides of Congress rejected such broad exclusion and amended the bill to require that before caterers or other food service establishments may be exempted they must satisfy the "retail or service establishment" tests of § 13(a) (2).

Not so.

In choosing the Ayres substitute as the foundation for argument, the Department of Labor chose shifting sands indeed. Only by ignoring the entire text of that bill (or even the Senate and Conference Committee reports to the 1961 amendments) can one avoid seeing that under the provisions of the Ayres substitute caterers, restaurants, and similar establishments were *all* specifically excluded from coverage. Thus, § 3(s) of the Ayres substitute provided:

> (s) "Retail establishment" shall mean an establishment 75 per centum of whose annual dollar volume of sales of goods is not for resale and is recognized as retail sales in the particular industry, *but shall not include an establishment such as (but not limited to) hotels, motels, restaurants (including lunch counters, cafeterias, and drive-ins), caterers,* hospitals, laundry and dry cleaning establishments, motion picture theaters, amusement or recreational establishments, parking lots, beauty or barber shops, and repair shops.[1]

Caterers, restaurants, lunch counters, and similar establishments were unequivocally removed from the category of "retail establishments," hence were not even intended to fall under the "retail establishment" exemption provision of

the Ayres substitute quoted in the petition for rehearing. They were, under the terms of that bill, *service* establishments undeniably and totally excluded from coverage. In the words of the managers on the part of the House, who in the conference report accompanying the final form of the bill compared the provisions of the House bill with those of the Senate and final versions, the House Bill "defines 'retail establishment' to *exclude* establishments which are primarily service establishments, and gives as examples of such establishments which are service establishments, *and therefore not covered,* the following: hotels, motels, *restaurants* (including lunch counters, cafeterias, and drive-ins), *caterers.* * * * *"[2]

*No exemption was needed for such establishments because they were excluded, i. e., they were never covered.* The exemption provision quoted in the petition for rehearing was therefore not directed to restaurants, caterers, or other similar food service establishments *per se,* but to food service facilities in other type "retail establishments." Referring to the effect of this provision, the conference report goes on, "[T]he House bill exempts employees employed in connection with a lunch counter, restaurant, or cafeteria in department, drug, and similar stores which qualify as retail establishments."[3] Obviously, such an exemption was necessary to prevent the possibility of unfair competition between a restaurant *per se* (by definition not covered by the House bill) and the restaurant facilities of, for example, a nearby drugstore whose employees would otherwise be covered and hence possibly required to be paid a higher wage.[4]

The House, therefore, never intended to cover at least those catering establishments which could not pass the abstract "sale for resale" and "recognition in the industry" tests of § 13(a) (2)—as sug-

---

1. 107 Cong.Rec. 4797 (1961). (Emphasis supplied.)

2. Conf.Rep.No.327, 87th Cong., 1st Sess. 14 (1961). (Emphasis supplied.) U.S. Code Cong. & Admin.News, p. 1707.

3. *Id.,* at 15.

4. See text, *infra,* at 1287.

gested by the Department of Labor—when it adopted the Ayres substitute. Exactly the opposite—it not only intended to exclude from coverage all caterers, but by the very exemption provision relied upon by counsel, it intended to exempt all restaurants, cafeterias, and similar food services operated by drug or department stores regardless of whether those food services could individually satisfy the abstract § 13(a) (2) "retail or service" tests.[5] On this legislative history it is perhaps needless to add that neither the Senate nor the managers on the part of the House and Senate could have been furthering the motive for the Ayres amendment, as alleged by the petition for rehearing, when they settled on the "retail or service establishment" language of § 13(a) (20).

## II. The Legislative Scheme of the 1961 Act Excluded From Coverage All Restaurants and Caterers

We have seen from the above analysis of the House bill that the House intended to exclude totally from coverage all caterers, restaurants and similar establishments—and expressed this intent by excluding them all in the same provision, pointing out in a single sentence of the conference report that all were not covered. In the Senate bill, caterers and restaurants were specified in separate exemption provisions, 13(a) (20) and 13(a) (2) (ii), respectively, and the effect of each was discussed separately in the accompanying committee report. Nevertheless, the legislative history shows that the Senate Committee on Labor and Public Welfare, whose subcommittee authored the bill, and the Senate intended caterers and restaurants to be exempt from the Act to the same extent and that this exemption was to be total.

At two points, once during the Senate debates[6] and once again after the Senate had passed the bill,[7] Senator McNa-

mara, chairman of the subcommittee that drafted the bill, placed in the Congressional Record a summary of its provisions declaring, in pertinent part:

> From this coverage in the retail trade the bill excludes the following:
>
> \*     \*     \*     \*     \*     \*
>
> (c) *Restaurants, including* lunch counters, *caterers,* and similar retail food service establishments.

Though specified in a separate provision, caterers were thus lumped into the restaurant category for purposes of defining in a concise manner the effect of the bill. The same understanding was twice more impressed upon the Senate after the differences between the House and Senate versions had been resolved in conference and the House had receded from its objections to the Senate bill, as amended (neither § 13(a) (2) (ii) nor § 13(a) (20) was amended in any way). Senator McNamara, in reporting the bill as amended in conference, prior to the start of the Senate debate thereupon, again placed a similar summary in the Congressional Record:

> From this coverage in the retail trade the bill excludes the following:
>
> \*     \*     \*     \*     \*     \*
>
> (d) *Restaurants, including* retail store lunch counters, *caterers,* and similar retail food services.[8]

And after the compromise bill had been passed by the Senate, Senator McNamara once more and in the same terms lumped caterers into the restaurant category for purposes of summarizing concisely the limitations on the extent of coverage the bill provided.[9]

Restaurants, and hence caterers, were understood and intended by the Senate to be wholly excluded from coverage. There was never any intent expressed by the committee or on the Senate floor that at least those who could not pass the abstract "retail or service establishment" tests of § 13(a) (2) ought to be

---

5. See text, *infra,* at 1287–1289.

6. 107 Cong.Rec. 5839 (1961).

7. 107 Cong.Rec. 6373 (1961).

8. 107 Cong.Rec. 7078 (1961).

9. 107 Cong.Rec. 7107 (1961).

covered. Rather, the legislative history is replete with evidence that *all* were meant to be excluded.

Reaching back to the second session of the 86th Congress, where efforts to amend the Fair Labor Standards Act initially got underway,[10] we find that when the first Senate bill was reported from the committee (by the then Senator Kennedy), it provided for coverage of *all* food service employees except those "primarily engaged in the preparation or offering of food or beverages for human consumption in an occupation in which gratuities customarily and usually received constitute a substantial part of the compensation for employment * * "[11] In other words, all but tipped food service employees were covered. This did not last long. By a lopsided vote (87–18) the Senate adopted an amendment offered by Senator Smathers and two other senators exempting "any employee employed by a hotel or motel, or any employee employed by a *retail or service establishment* who is employed in connection with the preparation or offering of food or beverages to the public for human consumption on the premises, or in any occupation closely related or directly essential thereto."[12]

Before the vote was taken Senator Smathers made it clear that his amendment was designed to exclude *all* restaurants from coverage, without qualification. They were, according to statements he made on the floor during debate, *by definition* retail or service establishments. *Viz.*, the following:

MR. SALTONSTALL: As I understand, the Senator's amendment includes restaurants and quick lunch counters. What would be the effect if a company operated quick-lunch counters in more than one state?

MR. SMATHERS: They would be exempt. The amendment has nothing to do with operations in one state. *It exempts from coverage all employees of hotels, motels, and restaurants* whether operating in one or more states.

    *     *     *     *     *     *

MR. LAUSCHE: Will the amendment exempt from the application of the law *all hotels, all motels, and all restaurants?*

MR. SMATHERS: *That is correct.* The amendment is intended to do that; yes. (Emphasis supplied.) [13]

Thus the entire Senate understood that the bill it passed in the 86th Congress exempted *all* restaurants.

There is nothing in the bill introduced in the 87th Congress or in its legislative history to indicate that this understanding changed. The committee report accompanying the bill in the 87th Congress contained only patently neutral reference to the restaurant exemption it provided,[14] and Senator McNamara stated to

---

10. In the 86th Congress, Second Session, both the House and Senate committees reported to their respective legislative bodies proposed bills which differed widely in many major provisions. Each side of Congress passed its own version and insisted it be adopted; House and Senate conferees were appointed but no agreement could be reached and the legislation died in conference. Nevertheless, the legislative history of the food service exemption provision the Senate passed then is revelant to an understanding of the Senate version in the 87th Congress since most of the Senate debate concerning coverage of food services took place in the 86th Congress and reference was had to the exemption provisions passed then by the chairman of the subcommittee that authored the second Senate version, Senator Mc-

Namara, in explaining the latter's effect. See note 15, *infra*.

11. S.Rep.No.1744, 86th Cong., 2nd Sess. 60 (1960).

12. 106 Cong.Rec. 16691–95 (1960). (Emphasis supplied.)

13. 106 Cong.Rec. 16692 (1960). (Emphasis supplied.)

14. The Senate Report accompanying the bill merely declared that "[b]y specific provision in the bill, the present exemption for retail and service establishments would continue in effect for * * * restaurants * * *." S.Rep.No.145, 87th Cong., 1st Sess. 28 (1961) U.S.Code Cong. & Admin.News, p. 1647. Also, in analyzing the exemption provided in § 13(a) (2) the report simply stated that this sec-

the Senate that this exemption was "similar" to the one provided in the previous bill.[15] Moreover, debate proceeded on the presumption that all restaurants were excluded.[16] Any remaining doubt that the Senate bill of the 87th Congress might have signalled in its wording an intent to subject restaurants to the "sale for resale" and "recognition in the industry" tests of § 13(a)(2) prior to granting exemption is laid to rest by the statement of the managers on the part of the House in the conference committee report, which, in comparing House and Senate versions of the bill, said,

---

tion "[a]mends the exemption for retail or service establishments so that the exemption will not apply to such establishments in newly covered enterprises, except where the establishment is one of the following, for which the exemption from both minimum wage and overtime is preserved: * * * (2) A hotel, motel, or restaurant. * * *" *Id.*, at 49 U.S.Code Cong. & Admin.News, p. 1668. It is impossible to discern from these references exactly how the committee was using the expression "retail or service establishment."

15. 107 Cong.Rec. 5839 (1961). Surely, had Senator McNamara intended to change the Senate's previous agreement that all restaurants were to be exempt, he would not have termed the exemption provided in the second Senate version "similar" to the first. It was of course not deemed the same because the second Senate bill was more explicit and physically split the prior food service exemption into two parts, §§ 13(a)(2)(ii) and 13(a)(20).

16. Exemplary are the following statements made during the course of the Senate debate:

> SENATOR JAVITS (Upon introducing an amendment requiring further study of the service industries): Mr. President, the purpose of my amendment is to add to section 12 of the bill, which calls for a study by the Secretary of Labor of agricultural, handling, and processing exemptions, a study also of the exemption afforded under the act with reference to hotel, motel, restaurant, and other food service employees, it being emphasized that if they had been included under the act they would have been included subject to the $1 million limitation and other restrictions upon coverage relating to intertate commerce. 107 Cong.Rec. 5826 (1961).
>
> Mr. HOLLAND (commenting on this amendment): Am I correct in my understanding that the amendment does not include within the purview of the bill employees of motels, hotels, and restaurants?

> Mr. JAVITS (in response): It does not. I regret to report that I was resoundingly defeated *in committee*, and I shall not bring that amendment to the floor. *Id.*, at 5827. (Emphasis supplied.)
>
> Mr. LAUSCHE (commenting on a substitute bill offered by Senator Dirksen): The substitute amendment and the House bill both exempt hotels, motels, restaurants, and motion picture theaters. The substitute bill does so on the basis that they are engaged in the rendition of service, as distinguished from the sale of goods. The reasons for exempting these business establishments in the bill as reported from the committee are not set forth. *Id.*, at 6086.
>
> Mr. SMATHERS: Mr. President, I think the committee very wisely recognized the fact that certain types of businesses called service businesses, should not be covered by the Federal minimum wage and maximum hours law. For that reason the committee left out hotels, restaurants, and motels. These belong to the service industry, which is not yet ready to assimilate increased costs and stay in business. I think the committee was wise in doing so. *Id.*, at 6243.
>
> Mr. LAUSCHE (during debate in the Senate on accepting the conference compromise bills): Therefore, if workers * * * who are employed by hotels, motels, restaurants, * * * believe that they will be covered by the bill, they have been deceived by the general discussion without having clearly pointed out to them the fact that they are exempted under the bill. *Id.*, at 7103.
>
> Mr. HOLLAND (a conferee responding to Mr. Lausche): Such workers will be disillusioned. If they have such an understanding as suggested by the Senator, that understanding is not in accord with the meaning of the bill, which clearly exempts them. * * * [A]s *admitted by the chairman of the conferees [Senator McNamara], it is as clear as crystal that those classes have been excluded from the coverage of the bill, Id.* (Emphasis supplied.)

The Senate amendment provides both a minimum wage and overtime exemption for employees of the following: hotels, motels, restaurants, * * * The House bill *reaches the same result* as the Senate amendment since under the bill's definitions these are service establishments *and therefore not covered* by the House bill.[17]

In harmony with the scheme of the House bill, which excluded from coverage *all* restaurants and caterers, the Senate bill excluded *all* restaurants, including caterers. This scheme was preserved in the compromise bill agreed upon in conference and ultimately enacted into law as the Fair Labor Standards Amendments of 1961, since that bill retained unaltered in sense and in form §§ 13(a) (2) (ii) and 13(a) (20), the exemption provisions of the Senate bill specific to restaurants and caterers.

It follows from this legislative scheme with respect to restaurants and caterers *per se,* Congress, in exempting in § 13(a) (2) (ii) "any employee employed by any *retail or service establishment* if such establishment—(ii) is in such an enterprise and is a *restaurant* * * *" and in § 13(a) (20) "any employee of a *retail or service establishment* who is employed primarily in connection with the preparation or offering of food or beverages for human consumption * * * by such services as *catering* * * *," intended to use the expression "retail or service establishment" in a descriptive rather than a limitative sense. Congress did not intend to apply these exemptions only to those caterers and restaurants capable of passing the abstract "retail or service establishment" tests of § 13(a) (2).

III. *Analysis of the § 13(a) (20) Exemption*

The mechanics of the § 13(a) (20) exemption also show that, as applied to establishments whose only business is catering, box lunch, or curb or counter service, the expression "retail or service establishment" must have been intended to be used merely in a descriptive sense.

> This section exempts any employee of a retail or service establishment who is employed primarily in connection with the preparation or offering of food or beverages for human consumption, either on the premises, or by such services as catering, banquet, box lunch, or curb or counter service, to the public, to employees, or to members or guests of members of clubs; * * *

Our investigation of the legislative history indicates that, besides exempting businesses engaged in catering, banquet, and the other food services *per se* § 13(a) (20) was also intended to exempt employees of department, drug and similar retail stores which are engaged in like food service operations.

This latter intent is illuminated best in the statement made in the conference report by the managers on the part of the House, which equated the exemption provided by § 13(a) (20) with the provision of the House bill exempting "any employee employed by a retail establishment who is employed in connection with a lunch counter, restaurant, or cafeteria in such establishment * * *" —an exemption the House provided solely for such facilities in drug, department, or similar retail stores.[18]

---

17. Conf.Rep.No.327, 87th Cong., 1st Sess. 15 (1961) U.S.Code Cong. & Admin.News, p. 1708. (Emphasis supplied.) As we have already seen, see text, at 1282–1284, *supra,* the result reached in the House bill was the total exclusion of such businesses.

18. The pertinent statement made by the House Managers in the conference report reads as follows:

> [T]he House bill exempts employees employed in connection with a lunch counter, restaurant, of cafeteria in department, and similar stores which qualify as retail establishments. The Senate amendment and the conference substitute (sec. 13(a) (20)) also exempt employees of retail or service establishments employed primarily in connection with the preparation or offering of food or beverages for human consumption,

Senator Dirksen the ranking Republican on the subcommittee that drafted the legislation in obvious explanation of the reasoning behind imparting to § 13 (a) (20) the dual purpose of exempting food services operated by department or drugstores and food services *per se* said:

> This is the situation. On one side of Main Street is an independent restaurant. * * * Then came the question of the department store which operated a lunch counter or a restaurant. If the department store was covered, its restaurant was covered. The point was made that that would be unfair competition. Therefore, it was necessary to exclude all food service establishments to make certain that there would be fairness in competition.[19]

That is, this exemption was motivated by a desire on the part of Congress to be evenhanded in applying the provisions of the Act so as to avoid giving some food service operators an undue competitive advantage over the others.

Thus, in order to permit them to compete effectively with independent caterers, drug and department stores providing catering service are excused from complying with the Act with respect to those employees employed primarily in connection with their catering operations. But most importantly for our purposes, there is no requirement in § 13(a) (20) that the department or drugstores' catering services must themselves pass the § 13(a) (2) "retail or service" tests before exemption is granted. So long

---

either on the premises, or by such services as catering, banquet, box lunch, or curb or counter service, to the public, to employees, or to members or guests of members of clubs. H.R.Rep.No.327, 87th Cong., 1st Sess. 15 (1961).

In view of this statement it might at first blush be thought appropriate to construe § 13(a) (20) as solely providing exemption for lunch counters and the like operated by department, drug, and similar stores which qualify as retail or service establishments and § 13(a) (2) (ii), although only specifying restaurants, as actually intended to provide exemption for the gamut of independent retail food services (including catering) as evidenced by Senator McNamara's persistent inclusion in his summaries of catering in the restaurant category (see text, at 5–6, *supra*). Further study and reflection, however, lead to the conclusion that § 13 (a) (20) must be interpreted as having the *dual* purpose of exempting food services provided by department and drug stores *and* independent establishments providing the food services § 13(a) (20) describes.

This duality of purpose is assumed in the very next sentence of the House managers:

> Clauses (2) and (20) of section 13(a) also are intended to continue the exemption for independently owned and operated restaurants in industrial plants, office buildings, Government installations, hospitals or colleges such as were involved in McComb v. Factory Stores [D.C., 81 F.Supp. 403] * * *.

Both clauses (2) and (20) are assumed in the sentence to apply to "restaurants" *independently* owned and operated. If

clause (20) were construed as restricted to restaurant and catering facilities of department, drug, and similar retail stores, i. e., such facilities owned and operated by these stores, a direct conflict would result between that and the statement of the House managers. Moreover, most of the locations named in the above passage would not have qualified under the 1961 Act as retail establishments.

Further support for the conclusion, that § 13(a) (20) has such a dual purpose is found in the wording of that section itself. It is the only section specifically naming catering and other types of retail food services. Second, it is difficult to conceive of a drug, department, or similar store which in addition to its usual fare offers some of the food services enumerated in § 13(a) (20), for example, banquet or curb service. The normal range of food services provided in such retail outlets would not be expected to extend beyond the "lunch counter, restaurant, or cafeteria" services enumerated in the House proposal which as we have already seen *was* limited to exempting such services provided by department and other retail stores.

19. 107 Cong.Rec. 6083 (1961). Senator Javits, in disagreement with the approach of the committee, said at one point in the debate: "I can think of nothing more fragmented than department store or drug store sales clerks being covered, and department store lunch counter employees or dishwashers remaining uncovered under the bill." 107 Cong.Rec. 5827 (1961). For the construction after the 1966 amendments, and the continuation of the phraseology to accomplish the dual purpose, see p. 1287, *infra*.

as the drug or department stores satisfy these tests their catering service employees are exempted.

To say that § 13(a) (20) expressly requires independent caterers and other food service operators to meet the abstract § 13(a) (2) retail or service establishment tests before obtaining exemption would therefore run contrary to Congress' intent to apply the food service exemption provision of the Act in an even-handed manner. Incongruous and patently unjust results would obtain. This is especially true with respect to caterers. As we pointed out in our original opinion:

> Were we to hold that catering establishments must meet the generalized tests of § 13(a) (2) for the "retail or service" nature of their activities before qualifying for consideration for exemption * * * a large percentage of caterers—those who do not collect their fees from the consumers of the meals provided—would never be able to claim the exemption. For their sales would be more readily characterized as sales for resale rather than direct sales to the consumer.[20]

Surely Congress never intended this result—one even more inequitable than that referred to by Senator Dirksen, given the normally greater resources of department and drugstores. Therefore in applying § 13(a) (20) to independent food service operators Congress must have intended "retail or service establishments" to be used merely in a descriptive sense, and we so hold.

IV. *The Effect of the 1966 Amendments to the Fair Labor Standards Act*

In support of its argument that Congress intended to apply the § 13(a) (2)

retail or service tests as "a predicate to implementing" § 13(a) (20), the petition for rehearing points to Congress' "careful retention of [that section's retail or service establishment wording in 1966] when it changed Section 13(a) (20) from a complete exemption to an overtime exemption only and moved it to Section 13(b) (18)."[21] By way of example the petition compares with this treatment "old Section 13(a) (19) which, when it was changed to a Section 13(b) overtime exemption, was amended so as to delete the requirement that the employing establishment qualify as a 'retail or service establishment.' "[22] We might also point up a comparison of our own— that when Congress moved the exemption for restaurants from § 13(a) (2) (ii) to § 13(b) (18), it also dropped all reference in the preamble to "retail or service establishments."

The reason behind the retention of the "retail or service establishment" language in new § 13(b) (18) is plain from our discussion in Part III of this opinion of the dual purpose of § 13(a) (20). Like its predecessor (with which it is identically worded) § 13(b) (18) is not only intended to exempt caterers and the other food services it names *per se*; it also is intended to exempt such food services when operated by department, drug, and similar retail establishments. *Had the "retail or service establishment" language been dropped this latter purpose would not have been expressed.* And the legislative history to the 1966 amendments makes explicit Congress' intent to retain this meaning.[23]

What is not expresed anywhere in the legislative history to these amendments is a purpose to do away with the 87th Congress' original intent to apply this provision evenhandedly to all the food

---

20. Hodgson v. Crotty Brothers Dallas, Inc., *supra*, at 1280.

21. Department of Labor, Petition for Rehearing En Banc, p. 9.

22. *Id.*

23. The Senate Report accompanying the 1966 bill provides:

> The minimum wage and overtime exemption contained in section 13(a) (20) of the act which covered food service employees is repealed, and an overtime exemption is provided such employees in a new section 13(b) (18). The employees covered by this exemption are food service employees of retail and service establishments, which may in-

services it embraces, whether operated independently or by department or drugstores. Nowhere to be found is an intent to exempt what few independent caterers might possibly pass the § 13(a) (2) tests while exempting all catering services supplied by department or drugstores, and we imply none.

The petition for rehearing emphasizes that the Crotty Dallas operation is part of a multimillion dollar enterprise. It may be true that the Crotty enterprise as a whole might have pockets deep enough to permit relatively painless compliance with the provisions of the Act in its treatment of the Crotty Dallas employees. That question was not before the District Court and it is not before us. Moreover, Congress made it clear that we should not determine coverage under the Act on such basis. The legislative history to the 1966 amendments expressly provides that regardless of

whether a retail or service establishment, including restaurants and caterers, is part of an enterprise, it is entitled to complete exemption under § 13(a) (2) so long as its annual dollar volume of sales is less than $250,000 and it does more than 50% of its business in the state in which it is located.[24] The Crotty Dallas operation indisputably meets these requirements; hence our conclusion that even under the 1966 version of the Fair Labor Standards Act Crotty Dallas is entitled to exemption from both the minimum wage and overtime provisions.

## V. *Supreme Court and Fifth Circuit Precedents*

The Supreme Court and Fifth Circuit cases cited by the Department of Labor in its petition for rehearing *en banc* are, contrary to the Department's assertion that the Court's opinion of 30 April 1971 "is clearly inconsistent with numerous decisions of [the Fifth Circuit] and the

---

clude drug stores, department stores, bowling alleys, and the like. S.Rep. No. 1487, 89th Cong., 2nd Sess. 32 (1966).

24. With respect to exemption of small establishments, both House and Senate reports make it clear that employees of small restaurants and catering services are not covered by the minimum wage and overtime provisions of the Act, regardless of whether they are in an enterprise. H.R.Rep.No. 13712, 89th Cong., 2nd Sess. 16, 17, 39–40 (1961). The Senate Report expresses this intent concisely:

Employees of small retail or service establishments * * * which have annual dollar volumes of sales of goods or services of less than $250,000 and which do more than 50 percent of their business within the state in which they are located, are exempted from the minimum wage and overtime provisions of the act. This establishment exemption applies to restaurants, retail food service establishments, hotels, motels, and other retail or service establishments as defined in the act. S.Rep.No.1487, 89th Cong., 2nd Sess. 11 U.S.Code Cong. & Admin.News, p. 3013 (1961). Section 201 of the bill provides that an employee of any retail or service establishment (*whether or not such establishment is in a covered enterprise*) which has an annual gross volume of

business of less than $250,000 is exempted from coverage by the act, if more than half of the establishment's annual dollar volume is from sales of goods or services made within the State where it is located. *Id.*, at 8 U.S. Code Cong. & Admin.News, p. 3009, (Emphasis supplied.)

This intent was even more clearly brought out in the Senate debate on the bill. Viz., the following:

Mr. FULBRIGHT: Do I understand correctly that, under existing law, an individual outlet or establishment of a retail chainstore enterprise is exempt from coverage if gross annual sales of the individual establishment do not exceed $250,000?

Mr. YARBOROUGH (chairman of the subcommittee responsible for the Senate version of the 1966 bill) : That is my understanding of the law. Each retail outlet is considered as a separate store, business, or unit.

Mr. FULBRIGHT: And is this true regardless of what might be the aggregate gross annual sales of the enterprise as a whole?

Mr. YARBOROUGH: That is correct.

Mr. FULBRIGHT: Do I understand correctly that the pending bill would make no change in this provision of existing law?

Mr. YARBOROUGH: That is correct.

Supreme Court," [25] inapposite to the instant case. While we go to the effort to discuss each of these cases individually below, we suggest that the overall error of the Department, in its analysis of our previous decisions in relation to the case at bar, is its failure to take cognizance of the rather unique legislative history, stretching over three Congresses, of the particular exemption we are called upon to construe here. Nor did the facts of the previous decisions call upon this court to do so.

In the first place, the Department's reliance on Arnold v. Ben Kanowsky, Inc.,[26] Mitchell v. Kentucky Finance Company,[27] A. H. Phillips, Inc. v. Walling,[28] Shultz v. Louisiana Trailer Sales,[29] and Wirtz v. Keystone Readers Service, Inc.,[30] for the generalized proposition that "exemptions from [the Fair Labor Standards] Act are to be narrowly construed against those claiming them," [31] is misplaced here. As is evident from the discussion in Parts II and III, supra, Congress intended to exclude *all* restaurants and catering establishments from coverage under the Act. Thus, the question of whether or not exemptions are to be narrowly construed against those claiming them hardly arises.

The same holds true in regard to the Department's assertion that our ruling here is "also inconsistent with numerous decisions of [the Fifth Circuit] which hold that the percentage tests of Section 13(a) (2) are 'prerequisites' for exemption under that Section." [32] None of the cases cited by the Department in support of this assertion concern restaurants, caterers, lunch counters, or similar food service establishments, all of which are totally excluded from coverage under the Act, as shown by our analysis of the legislative history, *supra*. Instead, the first cited, Tobin v. Celery City Printing Company,[33] involved a remand to determine whether or not a printing company, engaged in the production of goods for commerce and thus within the scope of the Fair Labor Standards Act, was exempt as a "retail sales" or "service establishment." The second, Schultz v. Instant Handling, Inc.,[34] involved a waste-handling and trash removal service. Since this service was rendered to industrial companies which shipped more than 80% of their products in interstate commerce, and since it was found to be closely linked and essential to such production, it was held to be within the purview of the Fair Labor Standards Act. Arnold v. Ben Kanowsky, Inc.,[35] the third case cited by the Department, involved sale of aircraft parts which were to be incorporated in aircraft which were themselves produced for subsequent sale.

While the Department asserts in its petition for rehearing that the exemption provided by § 13(a) (2) of the Fair Labor Standards Act is "limited" in nature and that "the limited nature of [this] exemption has been the subject of numerous decisions by the Supreme Court, [the Fifth Circuit], and other courts of appeals," [36] only one of the cases relied on by the Department in support of these propositions relates to restaurants, caterers, or similar food service establishments, such as is involved in the instant

25. Department of Labor, Petition for Rehearing En Banc, p. 2.

26. 361 U.S. 388, 80 S.Ct. 453, 4 L.Ed.2d 393 (1960).

27. 359 U.S. 290, 79 S.Ct. 756, 3 L.Ed.2d 815 (1959).

28. 324 U.S. 490, 65 S.Ct. 807, 89 L.Ed. 1095 (1945).

29. 428 F.2d 61 (5th Cir.), cert. denied, *sub nom.* Louisiana Trailer Sales, Inc. v. Hodgson, 400 U.S. 902, 91 S.Ct. 139, 27 L.Ed.2d 139 (1970).

30. 418 F.2d 249 (5th Cir. 1969).

31. Department of Labor, Petition for Rehearing En Banc, p. 3.

32. *Id.*, at 4.

33. 197 F.2d 228 (5th Cir. 1952).

34. 418 F.2d 1019 (5th Cir. 1969).

35. See note 26, *supra*.

36. Department of Labor, Petition for Rehearing En Banc, p. 5.

case. Mitchell v. Sherry Corine Corporation [37] involved a restaurant operator who sold food to an airline engaged in interstate commerce, which then resold and served the food to its passengers. *Sherry Corine* is unlike *Crotty Brothers Dallas* [38] in that the restaurant operator in *Sherry Corine,* in contrast to the operations of *Crotty Brothers Dallas* at St. Stephen's, delivered the food to the airline which then took possession of it. The *airline* then heated and served the food to its passengers, so that the restaurant operator had no contact at all with them. The restaurant operator, therefore, provided no direct service to the airline's passengers, and may be considered simply a food processor. A further difference between *Crotty Brothers Dallas* and *Sherry Corine* is that the latter involved a claim for "individual" exemption under the old § 3(i) of the Act, and thus is not directly relevant to a consideration of the "enterprise" exemption here under § 13(a) (2), former § 3(j).

The other cases cited by the Department do not bear at all on the instant case: Idaho Sheet Metal Works v. Wirtz,[39] which concerned the manufacture, installation and repair of sheet metal products and the sale, recapping and repair of tires; Acme Car & Truck Rentals, Inc. v. Hooper,[40] which involved an automobile and truck rental business;

Acme Tire & Battery Company v. Wirtz,[41] which concerned a tire recapping business; Wirtz v. Floridice Company, Inc.,[42] which involved ice sales to breweries for icing railroad cars and sales to shrimp boats; and Mitchell v. Pascal System,[43] which concerned an automobile rental company which was constantly selling its used cars to dealers for resale and buying new ones.

The Department's attempt to apply the reasoning of this court in Wirtz v. International Harvester Company [44] to *Crotty Brothers Dallas* must also fail, since *International Harvester* involved a subject (the sale of trucks) other than restaurants, caterers, lunch counters, or similar food service establishments, all specifically excluded from coverage under the Act.

The Department's assertion that the words "retail or service establishment" as employed in § 13(a) (2) of the Act are more than descriptive, on the basis of Walling v. W. D. Haden Co.,[45] may well be true in regard to establishments other than restaurants, caterers, lunch counters, and similar food service establishments. However, as observed in Part III, supra, to insist on the application of these tests to the latter would run counter to Congress' intent to apply the food service exemption in an evenhanded fashion.[46]

37. 264 F.2d 831 (4 Cir. 1959).

38. Hodgson v. Crotty Brothers Dallas, Inc., et al., 450 F.2d 1268.

39. 383 U.S. 190, 86 S.Ct. 737, 15 L.Ed.2d 694 (1966).

40. 331 F.2d 442 (5th Cir. 1964).

41. 330 F.2d 116 (5th Cir. 1964).

42. 381 F.2d 613 (5th Cir.), cert. denied, 389 U.S. 1043, 88 S.Ct. 786, 19 L.Ed.2d 834 (1968).

43. 226 F.2d 391 (7th Cir. 1955).

44. 331 F.2d 462 (5th Cir.), cert. denied, 379 U.S. 845, 85 S.Ct. 36, 13 L.Ed.2d 50 (1964).

45. 153 F.2d 196 (5th Cir.), cert. denied, 328 U.S. 866, 66 S.Ct. 1373, 90 L.Ed. 1636 (1946).

46. See note 38, *supra.* While the Tenth Circuit in Shultz v. Adair's Cafeterias, Inc., 420 F.2d 390 (1969), held that a central bakery was an "establishment" separate from the cafeterias which it served and the holding companies for the purpose of the application of the wage and hour provisions of the Fair Labor Standards Act, that case may be distinguished from *Crotty Brothers Dallas* on the grounds that the bakery in *Adair's Cafeterias,* due to a shortage of skilled labor, had been centralized into one operation, physically separated from the six cafeterias managed by the parent holding company, and was managed independently of the other corporations. As the Tenth Circuit in *Adair's Cafeterias* stated, "[t]he only business of this bakery was providing pastries to Adair eating establishments. The public was not invited

The Department also asserts in its petition for rehearing with respect to the instant case that

\* \* \* [the Court's] further holding on the "establishment point" so undermines prior decisions of this Court that it too, should be corrected. The panel's conclusion that Crotty's operations at St. Stephen's constitute a Crotty "establishment" separate and apart from the school, rests on its view that St. Stephen's teaching mission is functionally distinct from its obligation to feed the students.

But reliance on functional differences alone, without regard to any other considerations, is contrary to decisions of this Court, including the two on which the panel relies to support its opposite view (Mitchell v. Gammill [5 Cir., 245 F.2d 207], \* \* \* and Mitchell v. T. F. Taylor Fertilizer Works [5 Cir., 233 F.2d 284], \* \*) See also Wirtz v. Savannah Bank & Trust Company [5 Cir., 362 F.2d 857], \* \* \*[47]

But, as is clear from the discussion of this point in the original opinion in this case,[48] the functions of Crotty and St. Stephen's are less closely related than were those of, respectively, Factory Stores and Republic Steel in the case of McComb v. Factory Stores of Cleveland,[49] and those in Roland Electrical Company v. Walling.[50] This view is supported by a recent District Court decision in our Circuit, the court for the North Division of Georgia, Wirtz v. Campus Chefs, Inc.,[51] in which Judge Smith held that a corporation operating dining halls and cafeterias for educational and other public institutions was operating a "retail establishment" and "restaurant" within the purview of the Fair Labor Standards Act, even if the general public failed to frequent the establishment and even though students made payment to the college at registration rather than directly to the corporation. *Campus Chefs* held that the corporation operating, under contract, dining halls and cafeterias for educational and other public institutions was functionally distinct, even if not physically separate, from such institutions.[52] In addition, the court held that "there is no legal significance in the mode of payment"[53] and observed in this respect:

A considerable number of retail sales are made daily where the payment goes to a third party such as American Express, Diner's Club, bank credit plans,

nor allowed to purchase from the bakery. The bakery did not possess sufficient indicia to characterize it as a retail or service establishment under the exemption sections." (420 F.2d, at 395.) While the Department in its petition for rehearing asserts that the Tenth Circuit in *Adair's Cafeterias* "expressly held that the percentage tests incorporated in the definition of a 'retail or service establishment' by Section 13(a) (2) are 'a predicate to implementing' Section 13(a) (20)" (Department of Labor, Petition for Rehearing En Banc, p. 8), the Tenth Circuit in our opinion does not base its decision in *Adair's Cafeterias* on such a holding, but merely states that

*Alternative* [emphasis added] grounds for dismissal in the trial court were § 213(a) (2) (iv) and (a) (20). As a predicate to implementing either, Adair must show the bakery to be a retail or service establishment, which is defined as "an establishment 75 per centum of whose annual dollar volume of sales of goods or services (or both) is not for resale and is recognized as retail sales or services in the particular industry." 29 U.S.C. § 213(a) (2). (420 F.2d, at 395.)

This would not even apply, of course, to restaurants, caterers, lunch counters, and similar food service establishments, all of which, as discussed in Parts II and III, *supra*, are specifically excluded from coverage under the Act.

47. Department of Labor, Petition for Rehearing En Banc, pp. 10–11.

48. See note 38 *supra*.

49. 81 F.Supp. 403 (N.D.Ohio 1948), remanded, 179 F.2d 238 (6th Cir. 1949).

50. 326 U.S. 657, 66 S.Ct. 413, 90 L.Ed. 383 (1946).

51. 303 F.Supp. 1112. (1968).

52. As the court stated, "For an establishment to be functionally distinct, it is not necessary that it be physically separate." 303 F.Supp., at 1116.

53. *Id.*, at 1118.

private and civic clubs, lease arrangements, salary check-offs, and the like, wherein the seller looks solely to the third party for payment. The retail characteristics of the transaction are not destroyed by such payments nor are such purchases considered for resale merely because the consideration passes through an indirect conduit either before or after the actual transfer.[54]

The court therein went on to distinguish *Sherry Corine* [55] and Goldberg v. Warren G. Kleban Engineering Corp.,[56] stating that "[i]n those instances, however, there was no contact by the employer involved with the ultimate consumer nor were the sales at the very end of the stream of distribution which are the salient features of a retail sale." [57]

The cases cited by the Department in this regard may be distinguished from the case at bar. In Mitchell v. Gammill,[58] involving a local "general store" type business, this court held that if two businesses are functionally distinct, although proprietarily united and perhaps functionally linked, each must independently qualify for exemption as a "retail or service establishment" or come under the Fair Labor Standards Act. In the fact situation presented by *Gammill*, involving a market for the sale of groceries, meats, poultry, produce and other foodstuffs, a barbecue stand, a restaurant, a liquor store and bar, and a poultry processing department, this court found that, functionally, the various aspects of the store constituted a single entity qualifying as a "retail establishment." This determination rested on the finding that, in contrast to the instant case, in most respects of management this varied operation was conducted as a unit and was, with the exception of the barbecue stand, carried out in a single building.

In Mitchell v. T. F. Taylor Fertilizer Works,[59] where the issue was whether or not a fertilizer dry mixing plant and office were exempt from the Fair Labor Standards Act as a "retail establishment," this court concluded that the evidence as to whether the required percentages of sales were made at retail sustained a finding that the plant and office constituted such an "establishment." As this court recognized in *Taylor*, the distinction between retail and non-retail establishments turns on *functional* as well as geographic separation, although the latter is by no means required for exemption.[60] The latter case clearly presents a greater degree of functional separation (educational and food service) than did *Taylor* (plant and office).

The third case relied on by the Department here, Wirtz v. Savannah Bank and Trust Company,[61] involved bank ownership and management of a fifteen-story building, four floors of which the bank occupied while the remaining eleven were rented to various tenants. This court, in finding that the operation of the building and the banking business here constituted a single establishment and thus qualified for coverage under the

54. *Id.*, at 1119.

55. See note 37, *supra*.

56. 303 F.2d 855 (5th Cir. 1962).

57. See note 51, *supra*, 303 F.Supp. at 1119.

58. 245 F.2d 207 (5th Cir. 1957).

59. 233 F.2d 284 (5th Cir. 1956).

60. The place of the activities need not, however, be located in a physically separated place of business for the exemption to apply. See Statement of the Managers on the Part of the House, Conference Report No. 1453, 17 Oct. 1949, 81st Congress, 1st Session, 1949, 2 U.S.Code Congressional Service, at pp. 2252–53; Senate Report No. 145, 10 April 1961, 87th Congress, 1st Session, 1961, 2 U.S. Code Congressional and Administrative News, at p. 1647; Statement of the Managers on the Part of the House, Conference Report No. 327, 2 May 1961, 87th Congress, 1st Session, 1961, 2 U.S. Code Congressional and Administrative News, at p. 1708; McComb v. Factory Stores of Cleveland, 81 F.Supp. 403 (N.D. Ohio 1948), remanded, 179 F.2d 238 (6th Cir. 1949).

61. 362 F.2d 857 (5th Cir. 1966).

Fair Labor Standards Act, found that the bank's primary purpose in constructing the building was to permit it to locate in a desirable downtown area, to provide space for its future expansion, to improve its profitability, and to strengthen its public image—all clearly pointing to the existence of a single entity, in contrast to the situation in *Crotty Brothers Dallas*. As this court observed in Boisseau v. Mitchell,[62] the determination of what constitutes an "establishment," as well as the classification of the sales or services as either retail or non-retail, is a *problem of law to be decided from all the facts in each case.*

It is evident from the discussion in the original opinion[63] that the operations of Crotty Brothers Dallas at St. Stephen's are functionally separate and thereby constitute distinct "establishments." Despite the Department's assertion in its petition for rehearing that our holding in *Wirtz v. Keystone Readers Service, Inc.*—that a magazine reading club's "retailing activities * * * cannot constitute the seller's retail establishment"[64] —is "directly in point" in regard to whether or not Crotty's operations at St. Stephen's constitute a separate "establishment," *Keystone Readers Service* may be distinguished from the instant case. The company's central office in *Keystone Readers Service* was not a "retail establishment" in that it was not held out to the public as a place where magazines could be purchased. In addition, the "student salesmen" were not outside salesmen exempt from coverage under the Fair Labor Standards Act, since the orders they obtained were always replaced by final contracts arranged by other persons and on different terms than those negotiated by the "student salesmen." In contrast, as our original opinion here discussed with respect to § 13(b) (18) of the Act's exemption of retail or service establishments providing "catering * * * service to the public, to employees, or to members or

guests of members of clubs * * * "[65] Crotty's operations at St. Stephen's do qualify as a "retail or service establishment."

### VI. Conclusion

After considering the points raised by the Department's petition and starting our analysis where it should start—with the words of the Fair Labor Standards Act and the legislative history behind them, and considering in that light our previous decisions called to our attention by the Department, we conclude that our original determination, much more briefly expressed on these points, was correct.

Therefore, the petition for rehearing is denied and, no member of this panel nor judge in regular active service on the court having requested that the court be polled on rehearing *en banc* (Rule 35, Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12), the petition for rehearing *en banc* is denied.

---

62. 218 F.2d 734 (5th Cir. 1955).

63. See note 38, *supra.*

64. 418 F.2d 249, 258 (5th Cir. 1969).

65. See note 38, *supra.*