McCOMB, Adm'r of Wage and Hour Division, U. S. Dept. of Labor, v. FACTORY STORES CO. OF CLEVELAND.

No. 25297.

United States District Court
N. D. Ohio, E. D.

Oct. 5, 1948.

William S. Tyson, of Washington, D. C., and A. A. Caghan, of Cleveland, Ohio, for plaintiff.

Luther Day, of Cleveland, Ohio, for defendant.

FREED, District Judge.

The Administrator of the Wage and Hour Division of the United States Department of Labor demands a judgment permanently enjoining and restraining the defendant, Factory Stores Company, its officers and employees from violating the overtime compensation provisions of the Fair Labor Standards Act of 1938, Title 29 U.S.C.A. § 201 et seq.

The matter is before the Court on the complaint of the Administrator, the answer of the defendant, the stipulations, the oral and written evidence presented at the hearing, the arguments of counsel and comprehensive briefs of the respective parties.

The defendant, an Ohio corporation, with its principal office in Cleveland, Ohio, operates canteens, cafeterias and restaurants at industrial plants including the four units known as Units 38, 40, 45 and 47 on the premises of Republic Steel Corporation at Cleveland, Ohio, concerning which the instant controversy arises. The canteens and restaurants are operated under the provisions of a written agreement between the defendant and Republic, originally made in 1936, periodically renewed and now in effect as amended. The amendments, however, do not materially alter its general character.

There are 61 employees at the four units, whose duties relate to the preparation and serving of food. They are branch managers, cooks, assistant or short-order cooks, counter girls, dishwashers, porters and cashiers.

The agreement, inter alia, stipulates that the defendant is obliged at its expense to operate a general catering business for the employees of Republic at the various plants, or in such other locations as Republic may require and to furnish at all times good, wholesome food and numerous miscellaneous other items such as confections, soft drinks, tobacco, overalls, gloves, shop caps etc., as well as such other articles for which there may be a reasonable demand, at reasonable and current prices, to maintain efficient service, to arrange a schedule of operations for the service of hot food to correspond with the working hours of Republic in the respective locations and to supply service for both day and night forces subject to plant operations. The defendant is permitted to close certain of its units because of unprofitable operating conditions, but the curtailment of operations requires the full consent and approval of Republic. The agreement likewise provides that Republic shall have the privilege of authorizing an extension of such lunch service as Republic may deem advisable. When that privilege is exercised the defendant is charged with the obligation of operating new and existing office cafeterias and any other lunch service, and where no facilities are available, the defendant must establish fireproof canteens. Under its terms Republic furnishes the land on which the units are placed in operation and bears the cost of the original installation as well as the supplying of utilities. The defendant pays certain rentals, based upon a percentage of the gross receipts from the various canteens. There is no rental payment provided for the office cafeteria. The agreement further recites, that the defendant shall furnish coupon trade books for purchases at the canteens to such of its employees as are approved by Republic, and that Republic shall deduct from the wages of the employees payment for the coupon trade books and remit it to the defendant.

Unit 38 is the cafeteria in the office building of Republic operated by the defendant. The equipment is owned in part by Republic and in part by the defendant. It consists of two rooms. One of the rooms is arranged in typical cafeteria style and is patronized by office employees of Republic and plant supervisors. The other room is furnished as a dining room and is set aside for the exclusive use of the executive, administrative and professional personnel of Republic. Office employees of Republic serve as waitresses in the dining room. This unit is open for business for an hour and a half each morning and noon, except for Sundays and holidays. Aside from food, confections and tobacco are sold at the cafeteria. The average number of daily sales in the cafeteria are 275 and the gross receipts for 1945 were $28,646.20 and for 1946 were $24,428.39.

Unit 40 is located near the blast furnace department. The number of average daily sales in this canteen total 500. Except for the land all the property in connection with this operation is owned by the defendant. The blast furnace department operates twenty-four hours a day, seven days a week and employs approximately 591 men. The total receipts of the defendant at this canteen were $35,912.63 in 1945 and $41,338.35 in 1946. The canteen is open twenty-four hours a day, seven days a week.

Unit 45 is near the open hearth department. Approximately 3513 employees work in the department and the operations are on a twenty-four hour continuous daily schedule. Except for the land all property at the canteen is owned by the defendant. The canteen is open twenty-four hours a day, seven days a week. The average daily sales number 1500 and the total receipts in 1945 were $141,077.38 and in 1946 were $130,075.45.

Unit 47 is near the strip mill department. The building was erected and equipped by the defendant. All the property in connection with the operation of this unit except the land is owned by it. In June of 1946, the canteen building was destroyed by fire and until the completion of the present building in August of 1947, it was operated in a temporary structure. Ap-

proximately 2048 employees of Republic work in the strip mill department. In this canteen about 1800 sales are made each day. As the mill is on a twenty-four hour daily schedule, the canteen is open twenty-four hours a day, seven days a week. The gross receipts were $132,344.43 and $140,795.65 for the years 1945 and 1946 respectively.

Approximately 77% of the defendant's gross receipts from the four units in question are derived from food items, soft drinks and candy and the balance from the sales of cigarettes and miscellaneous goods.

The plant of Republic is located in the midst of the industrial section of the Cuyahoga River Valley, known as the "Flats", covers a large area of about 540 acres and is enclosed by fences. It employs approximately 7000 workers. In this plant the wheels of industry turn continuously twenty-four hours a day. The men work in three eight-hour shifts. The Company rule prohibits the production workers from leaving the premises during the shifts they work, except in cases of emergency, so that when they enter the plant they invariably remain there until their working hours are concluded. With rare exceptions the men adhere strictly to this rule. Guards are stationed at the various gates to prevent the entrance of the general public to the plant.

It is a well recognized steel mill custom, in vogue at the Republic plant, where the operations are continuous, not to have a definite lunch period. The men eat whenever they get an opportunity, so that it does not interfere with the performance of their duties. On such occasions they are allowed 15 to 20 minutes for their meals. In those few departments where the operations permit there is a set lunch period of a half hour.

The location of the Republic plant, aside from the limitation of time for eating, makes it impractical for the men to eat at outside restaurants. They therefore have to rely on the food they bring in their lunch buckets, the food obtainable from a few lunch wagons and on the food bought at the canteens of the defendant, for their nourishment during the work day. Even the men who are given a half hour lunch period, would find it very difficult if not impossible with the available transportation facilities, to make the necessary trips to outside restaurants during the time permitted, so that they too rely on the lunch bucket, the lunch wagon and the defendant's canteens.

Steel mill operations require that on frequent occasions men be asked to work an additional eight-hour shift without advance notice. Prior to the time when the defendant's canteens were on the premises, the foremen went to an outside restaurant and purchased at Republic's expense sufficient food to supply those working double shifts Since the canteens were installed, however, each man is given an order for a sixty cent meal by Republic for which he obtains food at the defendant's canteens. In the year 1945, Republic paid defendant for 75,135 such orders, occasioned by the men working extra shifts.

Most of Republic's workmen patronize the canteens. They either buy their entire meal, or supplement the contents of their lunch buckets by purchases of various food items, at the canteens. Those who are able to leave their work go to the canteens to consume their food. In order to afford men an opportunity to obtain food, coffee, candy and cigarettes from the canteens at times when they are compelled to remain at their work, the practice has developed of the foremen appointing Republic employees as "Canteen boys" for their respective departments. The "Canteen boys" take orders from their fellow employees, go to the canteens, have the orders filled and deliver them to the men in boxes made in the carpenter shop of Republic for that purpose. Each purchase made by the "Canteen boys" is recorded by defendant as a single transaction.

In addition to the employees of Republic the personnel of the River Terminal Railway Company, a wholly owned subsidiary of Republic, the crews of freighters tied up at Republic docks and the drivers who are loading or unloading trucks on Republic premises have access to defendant's canteens. But aside from these casual patrons of the canteens, the defendant caters solely to the 7000 workers of Republic.

The patronage and service rendered at the office building cafeteria and Republic's participation in that operation, was adequately described above, but for the fact that it should be observed that the dining room in the cafeteria, which was set aside for the sole use of some of the officials, was also used for meetings of those executives devoted to the business of Republic.

On the basis of these recited facts as gleaned from the evidence, the Administrator contends that the cafeteria and canteen employees, with the exception of those who are employed in an administrative capacity, are entitled to the protection of the provisions of the Fair Labor Standards Act.

It is stipulated (a) that substantially all the goods produced by Republic and its employees in the Cleveland plant, during the time covered by this controversy, have been and are being shipped directly or indirectly in interstate commerce and (b) that if the employees are subject to the Act and not exempt therefrom by any provisions of it, then they shall be deemed to have been compensated by the defendant contrary to the provisions of Title 29 U.S.C.A. § 207(a).

The applicable sections of the law are set forth in the margin.*

The defendant urges three defenses to the claim of the Administrator: First, that its employees are not engaged in the production of goods for commerce; second, that each of the defendant's units is a retail or service establishment within the meaning of Title 29 U.S.C.A. § 213(a) (2) and, therefore, its employees are not engaged in the production of goods for commerce within the meaning of Title 29 U.S.C.A. § 207(a), and third, that defendant's employees at its four units are employed in a local retailing capacity within the meaning of Title 29 U.S.C.A. § 213(a) (1) and as defined by the Administrator's regulations.

It is clear that defendant's employees are not employed in producing, manufacturing, handling or in the transportation of steel. Consequently, the problem first presented is, whether they are employed in a "process or occupation necessary to the production" of steel.

The effort to determine what type of occupations or activities of workmen are embraced within the definition of the phrase "necessary to the production of goods for commerce", contained in the Act, resulted in a great deal of litigation in the courts, which necessarily brought forth divergent views and differences of opinion.

Whether maintenance employees of loft buildings whose tenants were engaged in the production of goods for interstate commerce are protected by the provisions of the Act was considered in Kirschbaum Co. v. Walling, 316 U.S. 517, 62 S.Ct. 1116,

---

* "Section 203. Definitions

"As used in sections 201–219 of this title * * *

"(j) 'Produced' means produced, manufactured, mined, handled, or in any other manner worked on in any State; and for the purposes of this chapter an employee shall be deemed to have been engaged in the production of goods if such employee was employed in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, or in any process or occupation necessary to the production thereof, in any State."

"Section 207. Maximum hours

"(a) No employer shall, except as otherwise provided in this section, employ any of his employees who is engaged in commerce or in the production of goods for commerce—

"(1) for a workweek longer than forty-four hours during the first year from the effective date of this section,

"(2) for a workweek longer than forty-two hours during the second year from such date, or

"(3) for a workweek longer than forty hours after the expiration of the second year from such date,

unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."

"Section 213. Exemptions

"(a) The provisions of sections 206 and 207 of this title shall not apply with respect to (1) any employee employed in a bona fide executive, administrative, professional, or local retailing capacity, or in the capacity of outside salesman (as such terms are defined and delimited by regulations of the Administrator); or (2) any employee engaged in any retail or service establishment the greater part of whose selling or servicing is in intrastate commerce; * * *."

1118, 86 L.Ed. 1638. The court after reciting that: "These employees perform the customary duties of persons charged with the effective maintenance of a loft building. The engineer and the firemen produce heat, hot water, and steam necessary to the manufacturing operations. They keep elevators, radiators, and fire sprinkler systems in repair. The electrician maintains the system which furnishes the tenants with light and power. The elevator operators run both the freight elevators which start and finish the interstate journeys of goods going from and coming to the tenants, and the passenger elevators which carry employees, customers, salesmen, and visitors. The watchmen protect the buildings from fire and theft. The carpenters repair the halls and stairways and other parts of the buildings commonly used by the tenants. The porters keep the buildings clean and habitable," concluded that there is no requirement in the Act that the employees must themselves participate in the physical process of the making of the goods before they can be regarded as engaged in their production. It found, that the work of the employees described had "such a close and immediate tie with the process of production for commerce, and was therefore so much an essential part of it, that the employees are to be regarded as engaged in an occupation 'necessary to the production of goods for commerce.'"

In Roland Electrical Co. v. Walling, 326 U.S. 657, 66 S.Ct. 413, 416, 90 L.Ed. 383, the court decided that mechanics employed by a corporation which was engaged in the business of repairing electric motors and equipment for firms, who were in the production of goods for interstate commerce, were within the coverage of the Act and commented that for an employee to be so covered, it is not required " * * * that the occupation in which he is employed be indispensable to the production under consideration. It is enough that his occupation be 'necessary to the production.' There may be alternative occupations that could be substituted for it but it is enough that the one at issue is needed in such production and would, if omitted, handicap the production."

In Warren-Bradshaw Co. v. Hall, 317 U.S. 88, 63 S.Ct. 125, 87 L.Ed. 83, members of a rotary crew engaged within a state as employees of an independent contractor in partially drilling oil wells, later completed by employees of another contractor, from which eventually oil and gas moved in interstate commerce, were held to have been engaged in a "process or occupation necessary to the production" of oil for commerce within the purview of the Act.

In Walton v. Southern Package Corporation, 320 U.S. 540, 64 S.Ct. 320, 88 L.Ed. 298, a night watchman for a manufacturing plant which shipped a substantial portion of its goods in interstate commerce was regarded to be one engaged in an occupation "necessary to the production of goods" for interstate commerce.

In Armour & Co. v. Wantock, 323 U.S. 126, 65 S.Ct. 165, 89 L.Ed. 118, fire-guards employed by a manufacturer of goods for interstate commerce, were held by the court as employees embraced by the Act.

The court's language, on page 129, of 323 U.S., 65 S.Ct. on page 166, is highly enlightening as to the character of employment that may be included within the scope of the Act:

"The courts below held that the respondents were included in this class. The petitioner seeks to limit those entitled to this classification by reading the word 'necessary' in the highly restrictive sense of 'indispensable,' 'essential,' and 'vital'—words it finds in previous pronouncements of this Court dealing with this clause. Kirschbaum Co. v. Walling, 316 U.S. 517, 524-526, 62 S.Ct. 1116, 1120, 1121, 86 L.Ed. 1638; Overstreet v. North Shore Corp., 318 U.S. 125, 129, 130, 63 S.Ct. 494, 497, 498, 87 L.Ed. 656. These and other cases, says petitioner, indicate that in applying the Act a distinction must be made between those processes or occupations which an employer finds advantageous in his own plan of production and those without which he could not practically produce at all. Present respondents, it contends, clearly fall within the former category because soap can be and in many other plants is produced without the kind of fire protection which these employees provide.

"The argument would give an unwarranted rigidity to the application of the word 'necessary,' which has always been recognized as a word to be harmonized with its context. See McCulloch v. Maryland, 4 Wheat. 316, 413, 414, 4 L.Ed. 579. No hard and fast rule will tell us what can be dispensed with in 'the production of goods.' All depends upon the detail with which that bare phrase is clothed. * * * What is required is a practical judgment as to whether the particular employer actually operates the work as part of an integrated effort for the production of goods."

In 10 East 40th Street Building, Inc., v. Callus, 325 U.S. 578, 65 S.Ct. 1227, 1229, 89 L.Ed. 1806, 161 A.L.R. 1263, the court was concerned with the maintenance employees of an office building used for offices by every variety of tenants including some producers for interstate commerce. And it held that they did not have such a close and immediate tie with the process of production, as to be deemed engaged in an operation "necessary for the production" of goods for commerce within the meaning of the Act.

In Borden Company v. Borella et al., 325 U.S. 679, 65 S.Ct. 1223, 89 L.Ed. 1865, 161 A.L.R. 1258, the maintenance employees of the office building of a manufacturing concern in which 58% of the rental space was used for its central offices, where its production of goods for interstate commerce was administered, managed and controlled, although the goods were actually produced at plants located elsewhere, were held to be covered by the Act.

In Martino v. Michigan Window Cleaning Co., 327 U.S. 173, 66 S.Ct. 379, 90 L.Ed. 603, it was the view of the court that a corporation's employees, whose work consisted of washing windows on the premises of customers engaged in the "production of goods" for interstate commerce, were within the Act.

■ It is quite apparent from the study of these various decisions that there is no slide rule measure or inflexible formula, by which determination may be made as to what activities, type of work, occupation, or lines of endeavor are to be regarded "necessary to the production of goods for commerce." Each case must be viewed in its own setting. Decision must rest on whether the specific circumstances bring the case within the controlled sphere of the law.

■ Modern industrial operations have become so vast and the varied activities carried on to promote efficient production so infinite, that it is extremely difficult to evalute the relation of the job of each individual to the actual production of the goods for interstate commerce. It is true that the manufacturing process could proceed without the contribution or the effort of many employees. But it is manifest from the view expressed in the adjudicated cases that if their work in any manner contributes to, furthers, or benefits the efficient and safe method of production, they are entitled to the protection afforded by the Act.

■ The analysis of all the pertinent facts in this action brings the Court to the unavoidable conclusion that the cafeteria and canteen employees of the defendant are engaged in an occupation "necessary for the production of goods" for interstate commerce.

■ It is scarcely required to summon the testimony of expert witnesses to acknowledge the well accepted fact that men are better equipped to do efficient work and increase their productive capacity when they work in favorable surroundings, in clean, wholesome atmosphere, in well lighted and well arranged plants. Not only must desirable mechanical tools be provided, but it is equally important that provision be made for adequate sanitary facilities. It is similarly apparent that employees, when they become weary, must have a place to rest and that they must be able to obtain food at a conveniently placed location to sustain them during the work day.

"In the production of goods the fueling of the human beings who operate the machines is just as essential as the fueling of the boilers which run those machines, and it cannot be denied that the feeding of the employees conveniently and quickly and without their being required to leave the plant is an effective step in maintaining.

production." Basik v. General Motors Corp., 311 Mich. 705, 708, 19 N.W.2d 142, 143, 159 A.L.R. 966.

The defendant lays great stress on the contention that its employees provide a service which is a mere convenience to the workers at the plant and hence they are not engaged in occupations necessary for the production of goods for commerce. In suggesting the argument, the defendant is relying upon a conclusion wholly unwarranted from the evidence in this case. The work of these employees is so intimately associated with and so closely tied up with the production of goods for commerce, as to become an integral part of it. You can no more divorce the people occupied in the process of feeding the men, who manufacture the steel, from the coordinated pattern of modern steel manufacturing establishments than you can divorce it from the watchmen or guards in the plant, the men who keep the tools in good condition, the plumbers who repair the defective pipe lines, the bookkeepers, the timekeepers, the clerks, the messengers and the numerous other employees who constitute a well organized factory unit.

The cafeteria (Unit 38) is in effect a joint venture of defendant and Republic. It provides the restaurant facilities for the office building employees at a location close to their work. They are not required to travel any distance for their meals regardless of weather. Tardiness after lunch hours is prevented. The time allotted, permits of a rest period before resuming work. The cafeteria furnishes the managerial personnel with a room, where they discuss company problems during their meal hours.

The record abounds with testimony pointing to the importance of the food service provided by the canteens in facilitating the production of steel by Republic's employees.

During the labor shortage, when Republic was recruiting labor, one of the attractions held out by Republic was the factory canteen service provided at its plants. Indeed, when some laborers arrived without funds, Republic advanced them trade coupons to be used at the canteens.

Convincing expert testimony was offered to prove the general acceptance by industry of the importance of adequate in-plant feeding to production. The soundness of this, is made apparent when consideration is given to the fact that in the Republic plant some men must eat their meals in fifteen or twenty minutes when work permits, while others have a short lunch period; that the men are prohibited from leaving the Company's premises except in cases of emergency; that they perform arduous tasks in extreme heat and extreme cold; that outside restaurants because of the lack of transportation facilities are too remote to be patronized.

Republic officials were concerned with the type of service and the food served at the canteens. On the occasions when the men complained, there were frequent meetings between the Union and Republic representatives to discuss the quality and quantity of food served.

When one of the canteens was destroyed by fire, Republic took prompt steps to assist the defendant in restoring service at a temporary location. The testimony reflects that some of the men refused to work unless food was obtainable.

Republic used the canteen service to supply food to the men who were asked to work extra shifts by giving them, at company expense, sixty cent orders redeemable at the canteens. The men were induced to work the extra shifts, because they were able to get food and Republic was spared the trouble and expense of bringing it in from the outside.

This line of testimony evidences the need to Republic, rather than the convenience to the employees furnished by defendant's canteens.

Great emphasis is placed by the defendant on three cases which it claims support its position. The defendant relies, not on the majority, but on the dissenting opinion in Borden Company v. Borella et al., supra, and Dean Pound's criticism of the majority opinion. The fact, however, is, that the Court held the maintenance employees of the office building of a manufacturing concern, where its central offices were located, amenable to the provisions of the Act. The case of 10 East 40th Street Building, Inc., v. Callus, supra, is definitely not in

point, as the pertinent facts of the case stated above clearly demonstrate. In McLeod v. Threlkeld et al., 319 U.S. 491, 63 S.Ct. 1248, 87 L.Ed. 1538, the court decided that an employee whose work is to prepare meals and serve them to maintenance-of-way employees of an interstate railroad, in pursuance of a contract between his employer and the railroad company, was not "engaged in commerce" within the meaning of the Act. Some language is contained in the opinion which at first blush may appear to have some bearing on the issue presented in this case. However, what was said in Armour & Co. v. Wantock, supra, concerning the McLeod case, fully disposes of defendant's contention. In 323 U.S. at page 131 of the court's opinion 65 S.Ct. at page 167, 89 L.Ed. 118, following comments may be found:

"McLeod v. Threlkeld, 319 U.S. 491, 63 S.Ct. 1248, 87 L.Ed. 1538, which did exclude the employee from the scope of the Act, is not in point here because it involved application of the other clause of the Act, covering employees engaged 'in commerce,' and the test of whether one is in commerce is obviously more exacting than the test of whether his occupation is necessary to production for commerce."

Extended testimony was offered by the defendant to the effect that the food brought by the men in their lunch buckets was as nourishing as that purchased at the canteens, that some food could be obtained from lunch wagons or could be brought in from outside restaurants, to care for the daily need of employees or even when they worked on double shifts. The Court was told that efficient steel production was carried on by Republic before the canteens started their operations and that steel plants of some other companies do not have canteens. This type of testimony was apparently given for the purpose of proving that the canteens are not indispensable to production.

The Court is not called upon to decide an academic question, but to arrive at a decision on the basis of actual existing facts. Republic did contract with the defendant to operate the canteens. Most of the men obtained food from the canteens. They relied on their operations. The fact is that the canteens did a thriving business day in and day out. That in itself is highly indicative of the need for them. The claim that the productive efficiency of the men would not be decreased if the canteens were eliminated, is purely conjectural on the part of the defendant and finds no foundation in the evidence presented.

In Hanson v. Lagerstrom, 8 Cir., 133 F.2d 120, 122, in a suit by an employee of a cookhouse for overtime compensation against a lumber operator, the court said, where a like contention was made:

"The fact that defendant might have employed other methods, thus avoiding the necessity of maintaining a cook house, is not important. We are here 'confronted with a condition and not a theory'. We must here confine our consideration to what was actually done and not what might have been done."

It is entirely inconsistent with the evidence, to say that Republic entered into the contract for the operation of these restaurants solely to furnish a convenience to its employees without regard to promoting their productive ability. All the facts and circumstances convince this Court, that Republic, to relieve itself of the need to install its own in-plant feeding establishment, delegated that function to the defendant. It cannot be denied that in the final analysis, the canteens are a part of Republic's integrated system of efficient steel production.

The case of Roland Co. v. Walling, supra, is so completely dispositive of the claim that the defendant's employees are exempt from the Act because the cafeteria and the canteens are "retail or service" establishments as defined in Title 29 U.S.C.A. § 213(a) (2), as well as of the claim that they are employed in a "local retailing" capacity as defined in Title 29 U.S.C.A. § 213(a) (1), that to discuss them at great length would belabor an issue which was conclusively decided.

Nothing can be added by this Court to the exhaustive analysis of the Act, in that opinion, to demonstrate that the employees of the defendant are not contained within the ambit of the exemptions. The court remarked:

"It is rare, if not impossible, for an employee who is engaged in an occupation necessary to the production of goods for interstate commerce to be said to be at the same time an employee engaged in a retail or service establishment whose selling and servicing is confined to ultimate consumers. These employments are largely mutually exclusive. To the extent that sales or services are necessary for the production of goods for interstate commerce they generally are by that hypothesis not sales or services to an ultimate consumer for his personal use and, accordingly, are neither 'retail' sales nor services of a comparable character, within the meaning of § 13(a) (2).

"The logic of this result is as clear as the declared purpose, legislative history and administrative practice which combine to produce it. * * *

"There never was an intent expressed to exempt retailers other than the local merchants of the type dealing with the ultimate consumer. * * *

"The debates in Congress show an intent to restrict the word 'retail' to such transactions with ultimate consumers as are commonly carried on at local dry goods, butchering, or grocery stores."

The Court is of the opinion that all three defenses made to the claim of the Administrator are untenable. The injunction as demanded will be granted.