**James D. HODGSON, Secretary of Labor, United States Department of Labor, Plaintiff,**

v.

**ARA SERVICES, INC., a corporation, Defendant.**

**Civ. A. No. 72–C–24–D.**

United States District Court, W. D. Virginia, Danville Division.

March 24, 1975.

Marvin Tincher, U. S. Dept. of Labor, Nashville, Tenn., for plaintiff.

C. Stuart Wheatley, Clement, Wheatley, Winston & Ingram, Danville, Va., and Thomas W. Power, Washington, D. C., for defendant.

## OPINION

DALTON, District Judge.

The Secretary of Labor has brought this action under § 17 of the Fair Labor Standards Act, 29 U.S.C. § 201 et seq. (1965) (hereinafter referred to as Act) to enjoin ARA Services, Inc. (ARA), from violating the Act's minimum wage and record-keeping requirements, 29 U. S.C. § 15(a)(2), (5), with respect to employees of its food services operations at Hargrave Military Academy (hereinafter referred to as Academy) and to restrain the continued withholding of unpaid minimum wages and overtime. ARA has denied any violation of the Act, claiming that prior to February 1, 1967, the effective date of the 1966 Amendments, its employees were employees of a "retail and service establishment" within the statutory exemption provided by § 13(a)(2), 29 U.S.C. § 213(a)(2), and § 13(a)(20), 29 U.S.C. § 213(a)(20), and that for the period after February 1, 1967, its employees are within the statutory exemptions provided by § 13(a)(2), § 13(b)(8), 29 U. S.C. § 213(a)(2), § 213(b)(8), and § 13(b)(18), 29 U.S.C. § 213(b)(18).[1]

The parties have submitted this case upon stipulation of the facts. See Appendix A. In summary, ARA has contracted with the Academy to furnish meals at the Academy's dining room to students, faculty members, and their guests. The Academy and ARA calculated a fixed contract price on the basis of a twenty-one meal week for boarding students, and a five meal week for day students.[2] The students are charged this contract price regardless of whether that contract number of meals is actually eaten at the Academy. A non-student, such as a faculty member or a guest, is charged a fixed price for each meal actually eaten in the Academy's dining room. The Academy permits only authorized persons, such as students and guests, to eat in the dining room. The students and guests pay the Academy directly for meals, which pays ARA on a regular billing basis. Under the contract between the parties, the Academy furnished ARA with kitchen facilities and utensils, heat, refrigeration and utilities (except telephone service), building maintenance, and equip-

---

1. Prior to the effective date of the 1966 Amendments, February 1, 1967, § 13(a)(2) and § 13(a)(20) exempted covered employees from both the minimum wage and overtime provisions of the act. Under the 1966 Amendments, the restaurant exemption of § 13(a)(2) was reenacted as § 13(b)(8) and the § 13(a)(20) exemption, as § 13(b)(18); the Act was then restructured so that only § 13(a)(20) as amended provided an exemption from both the minimum wage and overtime provisions; §§ 13(b)(8) and 13(b)(18) provided exemptions only from the overtime provisions.

2. During the 1970–71 school year, for example, boarding students were charged $13.00 per week and day students, $3.75 per week.

ment repair. Students on work scholarships at the Academy serve as waiters without compensation from ARA. ARA prepares all the food in individual servings and cleans up the dining hall and kitchen after the meals. ARA prepares the menu which it submits to the Academy for approval.

Also by stipulation, the parties have submitted three questions to the court:

(1) Whether ARA's food service operation at the Academy constitutes a "retail or service establishment" within the meaning of § 13(a)(20) of the Act as amended prior to the effective date of the 1966 amendments and § 13(b)(18) of the Act as presently amended.

(2) Whether ARA's food service operation on the premises of the Academy constitutes a "restaurant" within the meaning of § 13(b)(8) of the Act as amended prior to the effective date of the 1966 amendments, and § 13(b)(8) of the Act as presently amended.

(3) Whether the statute of limitations applicable to this suit is two or three years under 29 U.S.C. § 255.

Because of this court's disposition of this case, it need not reach the third question.

To come within § 13(a)(2) and § 13(a)(20), (§§ 13(a)(2) and 13(b)(18) under the Act as presently amended), an employer must demonstrate that it qualifies as a "retail or service establish-

ment". Section 13(a)(2) defines a "retail or service establishment" as an establishment seventy-five (75) per cent of whose annual volume of sales are recognized as retail in the particular industry and are not for resale.[3]

In determining whether ARA comes within the Act's exemptions a brief discussion of the relevant history of the Act is helpful.

### I

### *History of the § 13(a)(2) and (a)(20) Exemptions*

As originally enacted in 1938, the Act's coverage was structured not in terms of types of businesses or enterprises, but rather in terms of employees "necessary" to the production of goods for commerce. Section 3(j), 29 U.S.C. § 203(j) (1938).[4] Consequently, to fall outside the Act, the employer had to show that its employees were either outside § 3(j) or within the then § 13(a)(2)[5] exemption for retail, intrastate operations. These opportunities to avoid the Act's coverage were severely narrowed, however, by the holding of McComb v. Factory Stores of Cleveland, 81 F.Supp. 403 (N.D.Ohio 1948), remanded 179 F.2d 238 (6th Cir. 1949). In *Factory Stores, supra,* the district court seized upon the word "necessary" in § 3(j) to find that Factory Stores' food service operation located in the production plant of Republic Steel Corpora-

---

3. A question exists whether an employer asserting the exemption contained in § 13(a)(20) (§ 13(b)(18) of the Act as presently amended) must satisfy the definition of "retail or service establishment" included in § 13(a)(2). The Court of Appeals for the Fifth Circuit has held that it need not. Hodgson v. Crotty Bros. Dallas, 450 F.2d 1268 (5th Cir. 1971). Although this court finds the reasoning of *Crotty Bros. Dallas* persuasive, it need not reach this issue since this court finds that ARA satisfies the definition of "retail or service establishment" contained in § 13(a)(2).

4. In the Act as originally enacted, § 3(j) read:

"Produced" means produced, manufactured, mined, handled, or any other manner worked on in any State; and from the purposes of this Act an employee shall be deemed to have been engaged in the production of goods if such employee was employed in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, or in any process or occupation *necessary to the production thereof,* in any State. (emphasis added)

5. At the time of the Factory Stores case, § 13(a)(2) exempted "any employee engaged in any retail or service establishment the greater part of whose selling or servicing is in intrastate".

tion was so integrated into Republic's overall operation that Factory Stores employees were "necessary" to Republic's production of goods, and therefore, covered by the Act as Republic employees themselves were. The court rejected Factory Stores' argument that its employees were within the retail exemption of § 13(a)(2), citing, as dispositive, language of the Supreme Court in Roland Electrical Co. v. Walling, 326 U.S. 657, 667, 66 S.Ct. 413, 417, 90 L.Ed. 383 (1946) that "to the extent that sales or services are necessary for the production of goods . . . they are by that hypothesis not sales or services to the ultimate consumer for his personal use and, accordingly, are neither 'retail' sales nor services of a comparable character, within the meaning of § 13(a)(2)."

In 1949, Congress responded to the *Factory Stores* and *Roland Electrical* decisions by rewriting § 3(j) and §

13(a)(2). Section 3(j) [6] as amended covered only employees engaged in a "closely related" occupation "directly essential" to the production of goods; section 13(a)(2) as amended particularized its intrastate requirements and included a definition of "retail and service establishment".[7] As the legislative history indicates, Congress intended through these amendments to overrule the *Factory Stores* decision and to modify the retail concept adopted by the Supreme Court in *Roland Electrical*— an establishment such as Factory Stores was to be outside § 3(j) and "retail" within § 13(a)(2), even if its sales were to a business customer.[8]

The next legislative response came twelve years later.

Although retaining § 3(j), Congress in 1961 restructured the Act around "enterprise" coverage by enacting sec-

6. § 3(j) as amended in 1949 provided:
   (j) "Produced" means produced, manufactured, mined, handled, or in any other manner worked on in any State; and for the purposes of this Act an employee shall be deemed to have been engaged in the production of goods if such employee was employed in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, or in any closely related process or occupation directly essential to the production thereof, in any State.

7. § 13(a)(2) as amended in 1949 read:
   (2) any employee employed by any retail or service establishment, more than 50 per centum of which establishment's annual dollar volume of sales of goods or services is made within the State in which the establishment is located. A "retail or service establishment" shall mean an establishment 75 per centum of whose annual dollar volume of sales of goods or services (or both) is not for resale and is recognized as retail sales or services in the particular industry.

8. The Statement of the Managers on the Part of the House, Conference No. 1453, 17 Oct. 1949, 81st Congress, First Session, 1949, 2 U.S.Code Congressional Service, pp. 2252–53 states:

Coverage of the act has . . . been extended [by the courts] to employees of an independently owned and operated restaurant located in a factory. (McComb v. Factory Stores, 81 F.Supp. 403 (N.D.Ohio 1948).
Under the bill as agreed to in conference an employee will not be covered unless he is shown to have a closer and more direct relationship to the producing, manufacturing, etc., activity than was true in the above-cited cases.

. . . . .

The following are some examples of cases in which the Administrator and court will no longer be able to hold the act applicable because the activities involved in such cases are not closely related or directly essential to production:

. . . .

[E] employees engaged in providing . . . eating . . . facilities for factory workers are quite clearly not performing any activities that are closely related or directly essential to the production of goods.
[With respect to § 13(a)(2)'s retail exemption], the location of the establishment, whether in an industrial plant, an office building, a railroad depot, or a Government park, *etc.*, will make no difference in the application of the exemption.
at Ibid, 2264–65.

tions 3(r) and 3(s).[9] These amendments conditioned the Act's coverage on the activities of an enterprise rather than on the activities of the employees within the enterprise, as did § 3(j). With the Act so structured, whether employees were within the Act's coverage as defined by § 3(j) lost its significance and the primary inquiry became whether employees were within a specific exemption. Congress accordingly sought to preserve the exclusions previously afforded by the narrowed language of § 3(j) by enacting a restaurant exemption to § 13(a)(2)[10] and the food service ex-

9. Section 3(r) provided:
(r) "Enterprise" means the related activities performed (either through unified operation or common control) by any person or persons for a common business purpose, and includes all such activities whether performed in one or more establishments or by one or more corporate or other organizational units including departments of an establishment operated through leasing arrangements, but shall not include the related activities performed for such enterprise by an independent contractor: Provided, That, within the meaning of this subsection, a retail or service establishment which is under independent ownership shall not be deemed to be so operated or controlled as to be other than a separate and distinct enterprise by reason of any arrangement, which includes, but is not necessarily limited to, an agreement, (1) that it will sell, or sell only, certain goods specified by a particular manufacturer, distributor, or advertiser, or (2) that it will join with other such establishments in the same industry for the purpose of collective purchasing, or (3) that it will have the exclusive right to sell the goods or use the brand name of a manufacturer, distributor, or advertiser within a specified area, or by reason of the fact that it occupies premises leased to it by a person who also leases premises to other retail or service establishments.
Section 3(s) provides:
(s) "Enterprise engaged in commerce or in the production of goods for commerce" means any of the following in the activities of which employees are so engaged, including employees handling, selling, or otherwise working on goods that have been moved in or produced for commerce by any person:
(1) any such enterprise which has one or more retail or service establishments if the annual gross volume of sales of such enterprise is not less than $1,000,000, exclusive of excise taxes at the retail level which are separately stated and if such enterprise purchases or receives goods for resale that move or have moved across State lines (not in deliveries from the reselling establishment) which amount in total annual volume to $250,000 or more;

(2) any such enterprise which is engaged in the business of operating a street, suburban or interurban electric railway, or local trolley or motorbus carrier if the annual gross volume of sales of such enterprise is not less than $1,000,000, exclusive of excise taxes at the retail level which are separately stated;
(3) any establishment of any such enterprise, except establishments and enterprises referred to in other paragraphs of this subsection, which has employees engaged in commerce or in the production of goods for commerce if the annual gross volume of sales of such enterprise is not less than $1,000,000;
(4) any such enterprise which is engaged in the business of construction or reconstruction, or both, if the annual gross volume from the business of such enterprise is not less than $350,000;
(5) any gasoline service establishment if the annual gross volume of sales of such establishment is not less than $250,000, exclusive of excise taxes at the retail level which are separately stated:
Provided, That an establishment shall not be considered to be an enterprise engaged in commerce or in the production of goods for commerce, or a part of an enterprise engaged in commerce or in the production of goods for commerce, and the sales of such establishment shall not be included for the purpose of determining the annual gross volume of sales of any enterprise for the purpose of this subsection, if the only employees of such establishments are the owner thereof or persons standing in the relationship of parent, spouse, or child of such owner.

10. Section 13(a)(2)(ii), 29 U.S.C. § 213(a)(2)(ii) provided an exemption for:
(2) any employee employed by any retail or service establishment, more than 50 per centum of which establishment's annual dollar volume of sales of goods or services is made within the State in which the establishment is located, if such establishment—

. . . . .

(ii) is in such an enterprise and is a . . . restaurant, . . . .

. . . . .

emption of [11] § 13(a)(20). Congress intended these amendments to continue the exclusions from the Act of such food operations as that in Factory Stores.[12]

In 1966, Congress narrowed the scope of previously enacted exemptions. It limited the application of the restaurant exemption of § 13(a)(2)·(ii) and the food service exemption of § 13(a)(20) (reenacted as § 13(b)(8) and (b)(18)) to the overtime provisions of the Act; section 13(a)(2), with the restaurant exemption deleted, continued to apply to both the minimum wage and overtime provisions.

## II

### ARA as a Retail Establishment

■ The above discussion disposes of two of the Secretary's arguments. The Secretary first asserts that ARA is not an "establishment" within the meaning of §§ 13(a)(2), and 13(a)(20) (§ 13(a)(2), (b)(8) and (b)(18) as amended by the 1966 amendments), and that its sales are not recognized as retail in the industry.

The term "establishment" is nowhere defined in the Act. Yet as the above discussion indicates, the present scope of the § 13(a)(2) and (a)(20) exemptions were intended by Congress to embrace independently owned and operated food operations such as that in *Factory Stores*. Thus, unless there exists a closer functional interrelationship between ARA and the Academy than that between Factory Stores and Republic Steel, any argument that ARA is not an establishment must perforce fall. This court is of the opinion that the relationship between ARA and Academy is not nearly so pervasive as the arrangement considered in *Factory Stores*.

The Secretary made the same argument in Hodgson v. Crotty Bros. Dallas Inc., 450 F.2d 1268, 1277 (5th Cir. 1971). That case concerned a food service operation whose contractual ties to a private school were nearly identical to the ARA-Academy arrangement. After a comparison of the Factory Store-Republic Steel relationship with that involved in that case, the court rejected the Secretary's argument and found the food service operation to be an "establishment". This court agrees with that finding and finds ARA to be an "establishment". The Secretary points to no contractual provision between ARA and the Academy that gives ARA and the Academy more functional unity than Factory Stores and Republic Steel. *See* Hodgson v. Crotty Bros. Dallas, Inc., *supra*, at 1277–1278.

The Secretary's second argument must also fail. As the above discussion indicates, Congress has clearly recognized by legislative action the retail character of sales by food operations such as ARA. This recognition was demonstrated in 1949 with the amendments to § 13(a)(2) and again in 1961 with the enactment of § 13(a)(20) (presently § 13(b)(18)). This court accordingly finds that ARA's sales are recognized as retail in the industry. *See* Hodgson v. Crotty Bros. Dallas, *supra*, at 1281–1295.

## III

### *ARA's Sales Are Not for Resale*

■ The next question is whether ARA's sales are "sales not for resale". Except for a specific situation concerning certain business materials,[13] the Act does not define the term "resale". Title 29, U.S.C. § 203(k) defines, however,

11. Section 13(a)(20) provides an exemption for:
   (20) any employee of a retail or service establishment who is employed primarily in connection with the preparation or offering of food or beverages for human consumption, either on the premises, or by such services as catering, banquet, box lunch, or curb or counter service, to the public, to employees, or to members or guests or members of clubs.

12. Senate Report No. 145, April 10, 1961, 87 Congress, First Session, 1961, 2 U.S.Code Congressional and Administrative News, at p. 1647; Statement of the Managers on the Part of the House, Conference Report No. 327, May 2, 1961, 87th Congress, First Session, 1961, 2 U.S.Code Congressional and Administrative News, at p. 1708.

13. 29 U.S.Code, § 203(n).

the terms "sale" or "sell" as including any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition; the Code of Federal Regulations, 29 C.F.R. § 779.330, stipulates that "resale" is the act of "selling again".

The cases dealing with the "sale for resale" issue offer no hard rules on which three-partite business arrangements result in "sale for resale".

The cases relevant to this issue can be conceptually classified into two types. The first type of case concerns an employer who has contracted with an organization to provide services or goods to its members. In this arrangement, courts have usually considered the contracting organization essentially a collection agent for the employer, characterizing it as a "conduit" through which funds flow from the purchaser to the employer-seller. The arrangement, courts have held, does not involve a sale for resale from the employer-seller to the organization. *See, e. g.,* Hodgson v. Prophet, 472 F.2d 196 (10th Cir. 1973); Wirtz v. Campus Chefs, Inc., 303 F. Supp. 1112 (N.D.Ga.1968).

The second type of case concerns an employer who transfers goods to an organization or person who in turn uses the goods as part of the service to its customers who are assessed one charge reflecting the cost of the goods consumed. *See, e. g.,* Goldberg v. Furman Beauty Supply, Inc., 300 F.2d 16 (3rd Cir. 1962) (supplying beauty aids to beauticians); Mitchell v. Sherry Corine Corp., 264 F.2d 831 (4th Cir. 1959), cert. denied 360 U.S. 934, 79 S.Ct. 1453, 3 L.Ed.2d 1546 (supplying without contract to two airlines daily requests for meals to be served on flights).

The ARA–Academy contractual arrangement falls clearly in line with the first group of cases. In no case found by this court involving a caterer to a school, such as ARA, has a court ruled that the relationship involved a sale to the school for resale. On the contrary, the courts have considered the school as merely a "conduit" through which funds to the employer-seller flow. The cases so holding present a number of varying contractual relationships, belying the importance the Secretary attaches to the specific contractual provisions between ARA and the Academy. The court therefore finds that ARA's sales of meals are not sales for resale.[14]

For the above reasons, this court holds that ARA is a retail or service establishment within the meaning of Sections 13(a)(20) and 13(b)(18).

## IV

### ARA is not a "Restaurant"

The remaining question put to this court—whether ARA constitutes a "restaurant" within the meaning of Sections 13(a)(2)(ii) and 13(b)(8)—must be answered negatively.

▮▮▮ The legislative history indicates that a "catering" or food services operation may also be characterized as a "restaurant".[15] All food service operations under § 13(a)(20) however are not "restaurants". It is the court's opinion that before a food operation can also be considered a "restaurant", it must possess the characteristics generally associated with a "restaurant"—individually priced meals and choice of menu, for example. *See* 29 C.F.R. § 779.387. ARA does not satisfy these requirements.[16] The court therefore holds that ARA is

---

14. The Secretary relies heavily upon Mitchell v. Sherry Corine Corp., supra. That reliance is misplaced. *Sherry-Corine* did not involve the business arrangement presented in this case. Furthermore, the airlines to whom the employer sold the meals were not mere "conduits" but were processors and preparers of the meals. The airlines further burdened the economic risks attendant

upon any resale operation, risks not burdened by the Academy. Finally, unlike the present case, the employer had no direct contact with the ultimate consumer.

15. See notes 8, 12.

16. Factory Stores' operation did have these characteristics. See McComb v. Factory Stores, supra, 81 F.Supp. at 404.

not a "restaurant" within the meaning of §§ 13(a)(2)(ii) and 13(b)(8).

For the above reasons, the court finds:

(1) That ARA is a "retail or service establishment" within the meaning of § 13(a)(20) and § 13(b)(18).

(2) That ARA is not a "restaurant" within the meaning of § 13(a)(2)(ii) and § 13(b)(8).

Therefore, it is the judgment of the court that plaintiff's claim be dismissed, without costs, and this action is stricken from the docket.

## APPENDIX A

### UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF VIRGINIA
### AT DANVILLE

PETER J. BRENNAN, Secretary of Labor, United States Department of Labor,

                Plaintiff

v.

ARA SERVICES, INC., a Corporation

                Defendant

CIVIL ACTION

FILE NO. 72–C–24–D

---

### STIPULATION

The parties stipulate and agree as follows:

1. Defendant is a corporation, incorporated in Delaware, with its principal offices at Independence Square, West, Philadelphia, Pennsylvania. From its main offices located at the above address, defendant provides logistical and support services including, but not limited to, accounting, legal, computer programs, dietician, merchandising, marketing research and purchasing, to its various establishments located in several different states.

2. The defendant's principal business activity is operating cafeterias, canteens, and automatic vending machines to provide meals, sandwich items, beverages and related items under contract with schools, colleges, universities and business firms. The corporation's various establishments perform the actual contractual services but major details involving such things as type of services and consideration to be paid are determined by the main office in Philadelphia, Pennsylvania. Other incidents of employment such as wages to be paid and hours of work are generally determined by defendant's local managers in the field.

3. At all times material to this action defendant has operated an establishment on the premises of Hargrave Military Academy in Chatham, Pittsylvania County, Virginia, within the jurisdiction of this Court. The primary services performed by the defendant, as hereinafter stated, were performed pursuant to a written contract with Hargrave Military Academy, hereinafter called "the school," which contract is attached hereto as Exhibit A and made a part of this stipulation as fully as if copied herein. This establishment was a part of the multi-state enterprise operated by the defendant.

4. Since July 17, 1969, and at all times material hereto, defendant has paid its employees at said establishment wages at a rate less than that required by section 6(a) of the Fair Labor Standards Act of 1938, as amended (29

U.S.C. 201, et seq.,) hereinafter referred to as the Act. The rate required to be paid under section 6(a) of the Act was and is $1.60 per hour. The rate required to be paid under section 6(b) of the Act was not less than $1.30 per hour from February 1, 1969, to February 1, 1970; and not less than $1.45 per hour from February 1, 1971; and not less than $1.60 per hour thereafter. At all times material hereto defendant has paid its employees at said establishment wages at a rate not less than required by section 6(b) of the Act.

5. The annual dollar volume of sales of defendant at its Hargrave Military Academy establishment for the years 1969, 1970, 1971, and 1972, based upon the rolling quarter method of calculation, was in excess of $250,000.

6. Pursuant to the contract designated heretofore, defendant furnished meals at the school's dining room to the students, some faculty members and occasional guests of the school's administration or students. On certain occasions defendant furnished meals for special events such as a "parents weekend." Additionally, when school was not in session defendant provided contracts to the attendees of religious events or business meetings being held at the school premises.

7. Defendant receives compensation from the school in the following manner:

(a) On a per student-per week basis. This rate is fixed depending upon whether or not a student is a boarding student or a day student. Boarding students are entitled to twenty-one meals per week. If a student is a day student, he is charged for five luncheons per week. These students are charged by the school for meals, the charge depending upon the number of meals to which the student is entitled. For example, during the 1970–71 school year, boarding students paid $13.00 per week to the school for meals and day students paid $3.75 per week to the school for their meals.

The school pays the defendant the amounts charged to the students for meals regardless of whether the students eat all of their meals in the dining hall or not. The students pay the school directly for the meals. Some students do not eat all of their meals even though all of their meals are paid for.

(b) In the event a non-student such as a member of the faculty or a guest of a student or the school, eats in the dining hall, a pre-set price is charged the person. Generally, the price of these meals is also collected by the school and remitted to defendant on a regular billing basis. In the event the defendant does not handle any cash transactions or collect directly from any person for meals furnished, the money collected is taken to the school's business manager, who gives the defendant credit for same.

8. The dining hall facilities are open to only those persons who are authorized to eat in the dining hall by the school. Persons who customarily eat at the school's dining hall include students, faculty members, and persons on campus for business reasons with the school, including alumni and community leaders.

9. Pursuant to the agreement between defendant and the school, the school furnishes defendant with all kitchen facilities and utensils, including glassware, silverware and chinaware, all heat, refrigeration and utilities (except telephone), building maintenance service, and repairs on all equipment. In addition, the school furnishes a sufficient number of students who are not employed by defendant but are on work scholarships to aid in paying their tuition and room and board, to carry the food from the kitchen or serving area and serve the meals at the dining tables.

The defendant submits to the school officials, for their approval, menus which cover several weeks. The defendant is responsible for its own staff which prepares all food, serves, mea-

sures each portion to go on each plate for the students to serve, and cleans up the dining hall area and kitchen.

10. Defendant did not compensate employees for time scheduled for employees to eat meals. Some employees state that they did not take time to eat meals in all cases. The exact number of employees who did not, in fact, take time to eat meals is subject to proof but would require many witnesses and substantial testimony. The parties have, therefore, agreed that in the event the defendant is subject to the minimum wage requirement of section 6(a) and the overtime provisions of the Act as hereinafter stated, the back wages due to the defendant's employees for the period ending March 7, 1972, the date the complaint was filed, is $31,078.05 if the Court finds that the statute of limitations applicable to this action in accordance with 29 U.S.C. § 255(a) is three years because of willful violation of the Act or $17,092.63 if the Court finds that the statute of limitations applicable is two years.

11. It is further agreed by the parties hereto that the only issues before the Court are as follows:

(a) Does the food service establishment operated by the defendant on the premises of Hargrave Military Academy constitute a retail or service establishment within the meaning of section 13(a)(20) of the Act prior to February 1, 1967 (and accordingly within the meaning of section 13(b)(18) of the Act as presently structured?)

(b) Does the food service establishment operated by the defendant on the premises of Hargrave Military Academy constitute a restaurant within the meaning of section 13(a)(2)(ii) of the Act prior to February 1, 1967 (and accordingly within the meaning of section 13(b)(8) of the Act as presently structured?)

(c) If neither question raised above is answerable in the affirmative, is the statute of limitations applicable to this action in accordance with 29 U.S.C. § 255(a) two or three years?

Dated this 21st day of August, 1974.
ARA SERVICES, INC.

Defendant

(s) David D. Dayton
By: David D. Dayton
Vice President

(s) Thomas W. Power
Thomas W. Power
Attorney for Defendant

(s) Marvin Tincher
Marvin Tincher
Regional Attorney

(s) Thomas L. Rasnic
Thomas L. Rasnic
Attorney
United States Department
of Labor Attorneys
for Plaintiff

United States Attorney

I affirm that the above person is a duly authorized officer of ARA SERVICES, Inc. and has the power to represent the Company in this matter.

(s) Martin W. Spector
Martin W. Spector
Assistant Secretary